# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### FORT MYERS DIVISION

BRIAN M. CASEY,

      Petitioner,

v.                                                      Case No. 2:15-cv-696-JLB-KCD

SECRETARY, DEPARTMENT OF
CORRECTIONS and FLORIDA
ATTORNEY GENERAL,

      Respondents.[1]

_____/

## OPINION AND ORDER

Brian Casey, a prisoner of the Florida Department of Corrections, petitions this Court for a writ of habeas corpus.   Before this Court for adjudication is Petitioner's *pro se* 28 U.S.C. § 2254 petition and his third amended petition filed by court-appointed counsel who has since withdrawn from representing Petitioner. (Doc. 1; Doc. 172.)   At the Court's direction (Doc. 288), Respondent, the State of Florida, filed a consolidated response to both petitions.   (Doc. 296.)   Petitioner filed a reply through his court-appointed counsel and a *pro se* reply.   (Doc. 303; Doc. 305.)

---

[1] When prisoners challenge their physical confinement, "the proper respondent is the warden of the facility where the prisoner is being held, not the Attorney General or some other remote supervisory official." Rumsfeld v. Padilla, 542 U.S. 426, 435 (2004).   Because the only proper respondent is the Secretary of the Florida Department of Corrections, the Court dismisses all other named Respondents.

Upon careful consideration of the numerous pleadings filed in this federal case, the extensive state court record, and the entire record before the Court, the Court concludes that none of Petitioner's *pro se* or timely-filed counseled claims entitle him to federal habeas corpus relief.   Because the Court was able to resolve the petition based on the record, an evidentiary hearing is not warranted.   See Schriro v. Landrigan, 550 U.S. 465, 474 (2007).

## I.     Background and Procedural History

### A.     Relevant State Court Proceedings[2]

On November 24, 2010, the state charged Petitioner by information with one count of second-degree murder with a firearm and one count of first-degree arson of a dwelling.   (Doc. 296-2 at 210–11.)   During the pendency of Petitioner's criminal proceedings, including trial, he was (at various times) represented by counsel, appeared *pro se*, or had the benefit of standby counsel.

After a jury trial, Petitioner was found guilty as charged.   (Doc. 296-3 at 574–75.)   The trial court sentenced him as a habitual violent felony offender to concurrent terms of life imprisonment without the possibility of parole on the murder count.   (Id. at 717–24.)   Florida's Second District Court of Appeal ("Second DCA") affirmed the convictions per curiam on October 18, 2013.   Casey v. State, 124 So. 3d 923, 923 (Fla. 2d DCA 2013).

---

[2] Petitioner has filed hundreds of *pro se* motions and other pleadings in state and federal court.   (See Doc. 296 at 7–8 (listing cases pursued by Petitioner prior to his filing ban).)   Only pleadings relevant to the Court's analysis of the federal habeas petitions are discussed here.

Between December 5, 2013, and April 2, 2014, Petitioner filed a series of motions and amended motions under Rule 3.850 of the Florida Rules of Criminal Procedure (collectively, "Rule 3.850 Motion").   (Doc. 296-3 at 913–60.)   The postconviction court denied the Rule 3.850 Motion in a written order with record attachments.   (Id. at 1089–1586.)   The Second DCA affirmed per curiam without a written opinion.   (See Doc. 186-3 at 135.)

On January 13, 2014, Petitioner filed a state petition for writ of habeas corpus alleging ineffective assistance of appellate counsel.   (Doc. 296-3 at 788–809.) The Second DCA denied the petition on June 25, 2014, without a written opinion. (Id. at 911.)

Between June 4, 2014 and August 3, 2016, the state trial court, the state appellate court, and the state supreme court barred Petitioner from filing additional *pro se* pleadings.   (Doc. 186-4 at 71; Doc. 186-5 at 32, 135); see also Casey v. State, 158 So. 3d 667, 668 (Fla. 2d DCA 2014) (finding that "Mr. Casey has failed to show cause why he should not be prohibited from filing any future *pro se* original pleadings in this court" and directing the clerk to "place in an inactive file any original proceedings filed by Mr. Casey [in certain circuit court case numbers] and notices of appeal related to circuit court case number 10-CF-19724, unless the filing is signed by a member in good standing of The Florida Bar").

**B.      Relevant Federal Habeas Proceedings**

Petitioner filed his first *pro se* 28 U.S.C. § 2254 petition for writ of habeas

corpus on November 1, 2015, raising eighteen claims.   (Doc. 1.)[3]   On October 18,

2016, the Court appointed the Office of the Federal Public Defender ("Habeas

Counsel") to represent Petitioner.   (Doc. 41.)   Without addressing the merits of any

specific claim, the Court concluded that Petitioner—because of his mental condition

and incarceration—was "severely hampered" in his ability to pursue his habeas

petition without the aid of counsel, specifically noting:

> Petitioner asserts, *inter alia*, that the state interfered with his right to
> file a direct appeal of his criminal conviction (Doc. 1).   If Petitioner's
> allegations are true, he states a constitutional claim with a fair
> likelihood of success on the merits.   Moreover, Petitioner has
> difficulty setting forth his claims or otherwise communicating with
> the Court.   As demonstrated in his numerous pleadings and motions,
> Petitioner appears to hold unrealistic beliefs regarding the
> circumstances surrounding his trial and incarceration.   As a result,
> the Court cannot effectively evaluate Petitioner's *pro se* pleadings.

(Id. at 3–4.)   On December 1, 2016, the Court directed Petitioner, through Habeas

Counsel, to file either an amended 28 U.S.C. § 2254 petition or a notice that he

wished to proceed on the original petition by January 30, 2017.   (Doc. 54.)   On

January 10, 2017, the Court extended Petitioner's time to file a counseled amended

petition until May 10, 2017.   (Doc. 59.)   The Court again extended the time to file

an amended petition until August 1, 2017.   (Doc. 91, Doc. 132.)

---

[3] Under the "mailbox rule," a pleading is considered filed by an inmate on the
date it was delivered to prison authorities for mailing, which—absent contrary
evidence—is the date it was signed.   Washington v. United States, 243 F.3d 1299,
1301 (11th Cir. 2001).   In this case, Petitioner signed the petition on November 1,
2015.   (Doc. 1 at 29.)

On January 22, 2018, Habeas Counsel[4] filed a 194-page amended petition, along with a 4989-page appendix and 285 individual exhibits.   (Doc. 137; Doc. 138; Doc. 139.)   The Court directed Habeas Counsel to file a second amended petition that did not exceed 50 pages.   (Doc. 142 at 2.)   As to the appendix, the Court advised that habeas review "is limited to the record before the state court that adjudicated the claim on the merits."   (Id. at 3 (citing Cullen v. Pinholster, 563 U.S. 170, 182 (2011)).)   The Court explained:

> Section 2254(d)(1)'s backward-looking language—"resulted in" and "involved"—requires an examination of the state-court decision at the time it was made.   It follows that the record under review is also limited to the record in existence at the same time—*i.e.*, the state-court record.   This understanding is compelled by the broader context of the statute as a whole, which demonstrates Congress' intent to channel prisoners' claims first to state courts.   The Supreme Court's precedents emphasize that review under § 2254(d)(1) is limited to what a state court knew and did.

(Id. (internal citations and quotation omitted).)[5]   The Court concluded that the amended petition's attached exhibits "serve only to obfuscate the preliminary issues

---

[4] Upon review of the extensive record in this case, it is clear that Petitioner and Habeas Counsel did not (and do not) agree on the best arguments to advance on federal habeas corpus review.   Accordingly, the Court will refer to the arguments made in the amended petitions as made by Habeas Counsel and to those in the original petition as made by Petitioner.

[5] Despite the Court's explanation, Habeas Counsel moved to conduct discovery (Doc. 143), seeking documents that were, in the Court's judgment, "too remote in time to be of benefit to the Petitioner's instant case."   (Doc. 159 at 5.) Habeas Counsel also sought all the evidence regarding the investigation of Petitioner's crimes, and the Court explained that "review under § 2254(d)(2) is limited to evidence presented in the State court proceeding."   (Id. at 8 (internal quotation omitted).)   The Court determined that "Petitioner's discovery request specifically states that Petitioner is looking for evidence not subjected to cross examination or challenged by trial counsel during the trial in an apparent attempt to second guess the investigations, evidence and trial strategy used by trial

before the Court" and advised that it would rely on the state court record (as provided by Respondent) or direct an expansion of the record if it determined such was necessary.   (Doc. 142 at 3–4.)

On February 20, 2018, Habeas Counsel filed a second amended petition along with a 143-page supporting memorandum.   (Doc. 148; Doc. 149.)   Habeas Counsel filed a third amended petition on December 18, 2018.   (Doc. 172.)   The third amended petition contained nine claims, most of which were never raised in state court.   (Id.)   On September 12, 2019, Respondent moved to dismiss (in whole or in part) most of the claims raised in the third amended petition on the grounds that the amended petition was untimely, and the claims did not relate back to those raised in the original timely petition.   (Doc. 185.)

The Court concluded that the third amended petition was untimely.   (Doc. 288.)   But the Court also concluded that Ground Four and parts of Ground Five of the third amended petition related back to the claims raised in the original timely petition.   (Id. at 20–22.)   Therefore, the Court dismissed Grounds One, Two, Three, Seven, and Eight of the third amended petition and directed a response to the remaining claims.   (Id. at 23.)   To ensure that Petitioner suffered no prejudice from Habeas Counsel's untimely filing, the Court also ordered Respondent to "briefly address the issues raised in Petitioner's original *pro se* petition (Doc. 1) to the extent they were not re-raised in the third amended petition."   (Id.)

---

counsel."   (Id.)   Finally, the Court determined that Habeas Counsel did not address why this discovery was unavailable in the state courts.   (Id.)

Respondent filed a response on March 17, 2023.   (Doc. 296.)   Petitioner filed a counseled reply on April 17, 2023, and a *pro se* reply on April 19, 2023.   (Doc. 303; Doc. 305.)[6]

In his federal habeas petitions, Petitioner raises claims of trial court error, ineffective assistance of trial counsel, and ineffective assistance of appellate counsel.[7]   The Second DCA denied Petitioner's claims of trial court error and ineffective assistance of appellate counsel without written opinions.

---

[6] Subsequent to Respondent's response to the third amended petition (Doc. 296), Petitioner moved to proceed *pro se* (Doc. 297) and also sought leave to file (and did file) a *pro se* reply.   (Doc. 304; Doc. 305).   Because of the unusual procedural history of this case and Petitioner's apparent concerns about the quality of his legal representation, the Court has, for the purpose of this Order, reviewed his *pro se* reply even though it was filed before the Court granted Habeas Counsel's motion to withdraw.   (Doc. 308.)   However, the reply contains far-fetched allegations regarding the forgery of numerous pleadings filed in this habeas case and in state court, and an assertion that "the forged petitions [submitted by Habeas Counsel] were part of a conspiracy to murder Petitioner that included the assistance of [Habeas Counsel] Donna Elm."   (Doc. 305 at 2.)   Petitioner also attached a statement describing his prison conditions and attempts by state officials to have him murdered during his incarceration in the Florida Department of Corrections. (See generally Doc. 305-1.)   Finally, Petitioner attached an amended petition to the reply.   (Doc. 305-2.)   The Court will not consider any new claims raised in Petitioner's *pro se* reply because "arguments raised for the first time in a reply brief are not properly before a reviewing court."   Herring v. Sec'y, Dep't of Corr., 397 F.3d 1338, 1342 (11th Cir. 2005) (internal alterations and quotation omitted). Moreover, while the Court has reviewed the pleading, it does not find that any arguments raised in the *pro se* reply entitle Petitioner to habeas relief, and at this stage of proceedings, the Court will not allow a fourth amended petition because Petitioner's proposed amended petition merely restates the issues raised in his original petition or alleges unexhausted and untimely or fanciful allegations, rendering amendment futile.   See Bryant v. Dupree, 252 F.3d 1161, 1163 (11th Cir. 2001) (recognizing that the Court need not allow a party to amend where amendment would be futile).

[7] Except as specifically noted, the claims were exhausted in state court.

## II.    Legal Standards

### A.    The Antiterrorism and Effective Death Penalty Act (AEDPA)

Under the AEDPA, federal habeas relief may not be granted with respect to a claim adjudicated on the merits in state court unless the adjudication of the claim:

(1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2).    In this context, "clearly established Federal law" consists of the governing legal principles, and not the dicta, set forth in the decisions of the United States Supreme Court at the time the state court issued its decision.    White v. Woodall, 572 U.S. 415, 419 (2014); Carey v. Musladin, 549 U.S. 70, 74 (2006) (citing Williams v. Taylor, 529 U.S. 362, 412 (2000)).

A decision is contrary to clearly established federal law if the state court either:   (1) applied a rule that contradicts the governing law set forth by Supreme Court case law; or (2) reached a different result from the Supreme Court when faced with materially indistinguishable facts.   Ward v. Hall, 592 F.3d 1144, 1155 (11th Cir. 2010) (citing Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2003)); Mitchell v. Esparza, 540 U.S. 12, 16 (2003). A state court decision involves an unreasonable application of the Supreme Court's precedents if the state court correctly identifies the governing legal principle, but applies it to the facts of the petitioner's case in an objectively unreasonable manner, Brown v. Payton, 544 U.S. 133, 134 (2005), or "if the state court either unreasonably extends a legal principle from [Supreme Court]

precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Bottoson v. Moore, 234 F.3d 526, 531 (11th Cir. 2000) (quoting Williams, 529 U.S. at 406).

The standard to obtain relief under 28 U.S.C. § 2254(d) is both mandatory and difficult to meet. To demonstrate entitlement to federal habeas relief, the petitioner must show that the state court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington v. Richter, 562 U.S. 86, 103 (2011). Moreover, when reviewing a claim under section 2254(d), a federal court must presume that any "determination of a factual issue made by a State court" is correct, and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e).

In all events, a state court's denial of a claim without a written opinion is entitled to section 2254(d) deference. See Harrington, 562 U.S. at 98. In the case of a silent affirmance, "a habeas court must determine what arguments or theories . . . could have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior [Supreme Court decision]." Id. at 102. In other words, when a state court's decision is unaccompanied by an explanation, the habeas petitioner must still meet his burden "by showing there was no reasonable basis for the state court to deny relief." Id. at 98. That is, a state court's summary rejection of a claim, even without explanation, qualifies as an adjudication on the

merits and warrants deference.   Ferguson v. Culliver, 527 F.3d 1144, 1146 (11th Cir. 2008).

Generally, in the case of a silent affirmance, a federal habeas court will "look through" the unreasoned opinion and presume that the affirmance rests upon the specific reasons given by the last court to provide a reasoned opinion.   See Ylst v. Nunnemaker, 501 U.S. 797, 806 (1991); Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018).   However, the presumption that the appellate court relied on the same reasoning as the lower court can be rebutted "by evidence of, for instance, an alternative ground that was argued [by the state] or that is clear in the record" showing an alternative likely basis for the silent affirmance.   Sellers, 138 S. Ct. at 1196.

### B.   Ineffective Assistance of Counsel

In Strickland v. Washington, the Supreme Court established a two-part test for determining whether a convicted person is entitled to relief on the ground that his counsel rendered ineffective assistance.   466 U.S. 668, 687–88 (1984).   A petitioner must establish that (1) counsel's performance was deficient and fell below an objective standard of reasonableness and (2) that the deficient performance prejudiced the defense.   Id.

The focus of inquiry under Strickland's performance prong is "reasonableness under prevailing professional norms."   Id. at 688.   In reviewing counsel's performance, a court must presume that "counsel's conduct falls within the wide range of reasonable professional assistance."   Id. at 689 (citation omitted).   A court must "judge the reasonableness of counsel's challenged conduct on the facts of the

particular case, viewed as of the time of counsel's conduct," applying a highly deferential level of judicial scrutiny.   Roe v. Flores-Ortega, 528 U.S. 470, 477 (2000) (quoting Strickland, 466 U.S. at 690).

Proving Strickland prejudice "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." 466 U.S. at 687.   "Strickland places the burden on the defendant, not the State, to show a 'reasonable probability' that the result would have been different" had counsel performed as Petitioner now argues he should have.   Wong v. Belmontes, 558 U.S. 15, 27 (2009) (quoting Strickland, 466 U.S. at 694).

A claim of ineffective assistance of appellate counsel is evaluated under the same standard as for trial counsel.   See Heath v. Jones, 941 F.2d 1126, 1130 (11th Cir. 1991).   Appellate counsel's performance will be deemed prejudicial only if the reviewing court finds that "the neglected claim would have a reasonable probability of success on appeal."   Id. at 1132.

## C.   Exhaustion and Procedural Default

The AEDPA precludes federal courts, absent exceptional circumstances, from granting habeas relief unless a petitioner has exhausted all means of available relief under state law.   28 U.S.C. § 2254(b)(1).   Exhaustion of state remedies requires that the state prisoner "fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights[.]"   Duncan v. Henry, 513 U.S. 364, 365 (1995) (internal quotation omitted).   The petitioner must apprise the state court of the federal constitutional issue, not just the underlying facts of the claim or a similar state law

claim.  Snowden v. Singletary, 135 F.3d 732, 735 (11th Cir. 1998).   Under the similar doctrine of procedural default, "a federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule."   Martinez v. Ryan, 566 U.S. 1, 9 (2012).

A petitioner can avoid the application of the exhaustion or procedural default rules by establishing objective cause for failing to properly raise the claim in state court and actual prejudice from the alleged constitutional violation.   Spencer v. Sec'y, Dep't of Corr., 609 F.3d 1170, 1179–80 (11th Cir. 2010).   To show cause, a petitioner "must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in state court."   Wright v. Hopper, 169 F.3d 695, 703 (11th Cir. 1999).   To show prejudice, a petitioner must demonstrate a reasonable probability the outcome of the proceeding would have differed.   Crawford v. Head, 311 F.3d 1288, 1327–28 (11th Cir. 2002).      A second exception, known as the "fundamental miscarriage of justice," only occurs in an extraordinary case, where a "constitutional violation has probably resulted in the conviction of one who is actually innocent[.]"   Murray v. Carrier, 477 U.S. 478, 479–80 (1986).

### III.   Discussion

The charges against Petitioner arose from the murder of Ryan Vanderson ("Vanderson") on October 15, 2010.   On this date, Vanderson's mother discovered the body of her son in the burning kitchen of the house he shared with his wife and daughter.   (Doc. 296-3 at 738–40; Doc. 296-4 at 645–49.)   An autopsy determined

that Vanderson died from a single gunshot wound to the back of his head.   (Doc. 296-3 at 740; Doc. 296-4 at 675.)   After he was shot, gasoline had been used to start fires on the first and second floors of Vanderson's home.   (Doc. 296-4 at 887, 1030, 1402, 1409, 1696, 1726.)

To better understand the claims discussed in this Order, a summary of the case history—as recounted in Petitioner's brief on direct appeal—follows:

> Vanderson's wife told the Sheriff's detective that an individual named "Brian," who was involved in an air conditioning business, was an acquaintance of her late husband.   After the police had developed [Petitioner] as a suspect, Vanderson's wife was shown a photo lineup and identified [Petitioner] as the person she knew as "Brian," the air conditioning guy.
>
> On October 20, 2010, the police, who had been looking for [Petitioner], found him as he was leaving his place of business, known as "AAA Cooling and Heating" ("AAA").   [Petitioner] was in a Dodge van, which was also occupied by a female, who was identified as Melissa Alvarez ("Alvarez").   [Petitioner] was placed under arrest, based on an outstanding warrant which charged [Petitioner] with "identity theft" in an unrelated matter, and was transported to police headquarters.   Alvarez was not arrested, but voluntarily agreed to accompany the police to headquarters. [FN5]
>
>> [FN5]   When Alvarez was questioned by the police on October 20th, she provided a statement that incriminated [Petitioner] in the killing of [V]anderson and the subsequent fire.   Alvarez, however, was never arrested or charged in the case.   By the time of [Petitioner]'s trial, in May 2012, Alvarez could not be located and did not testify as a witness at the trial.
>
> [Petitioner] was then interviewed by Det. John Lathrop ("Lathrop") of the Lee County Sheriff's Office.   During that interview, which took place on October 20, 2010, [Petitioner] admitted that he had a business relationship with [V]anderson.[FN6]   He also told Lathrop that he had arranged to meet with [V]anderson at his house on October 15th, but denied

being at Vanderson's house that day because he had cancelled the meeting.

> [FN6] Prior to being questioned on October 20th, [Petitioner] was given appropriate <u>Miranda</u> warnings, waived his <u>Miranda</u> rights, and agreed to speak with the police.

On November 2, 2010, Det. Lathrop came into possession of a letter that had been addressed to the "Homicide Detectives Division" and bore the return address of [Petitioner] at the Lee County Jail.   The letter, which was read to the jury at the trial, stated, in part:

> This letter is to inform you . . . that I'm going to plead guilty to the murder of Ryan Silverstein,[8] who I shot execution style . . . Unless you come to see me quick to collect evidence of others' involvement, dump sites, burn sites of evidence/phone records, and the last act of kindness I can give is a timely expedition of my cases, I have asked God to forgive me. Bring menthol cigarettes, we'll be awhile.

The letter was signed, "Sincerely, Brian."

After he received the above letter, Det. Lathrop immediately arranged for [Petitioner] to be transported from the jail to police headquarters.   After he arrived at police headquarters, [Petitioner] was again given the standard <u>Miranda</u> warnings and agreed to speak with Det. Lathrop.   During this interview, which was recorded on video and played for the jury at trial, [Petitioner] made numerous admissions which incriminated himself in Vanderson's killing.

After the interview was concluded, [Petitioner] accompanied the police on a "ride around," where [Petitioner] pointed out several locations where physical evidence associated with the murder/arson was located and also pointed out several locations where he and Alvarez had gone after the crimes had occurred. As a result of the "ride around," the police recovered numerous items of physical evidence which were introduced in evidence at trial and which linked [Petitioner] to the murder/arson.

---

8  Petitioner referred to Ryan Vanderson as "Ryan Silverstein" in his letter.

(Doc. 296-3 at 740–72 (citations to the record omitted and minor alterations made for clarity).)

At Petitioner's trial, the state sought to prove that Petitioner killed Vanderson, who sold advertising for "Easy to Use Blue Book" (Doc. 296-4 at 1596), by shooting him execution-style in the back of the head.   (Id. at 573.)   The state alleged during opening statement that after shooting Vanderson, Petitioner "sprayed bleach everywhere," hoping to use it as an accelerant.   (Id.)   Thereafter, Petitioner went to a gas station to purchase gasoline, returned to Vanderson's home, and used the gasoline to set fires in the upstairs bedroom and to Vanderson's body.   (Id. at 574.)   The state alleged that Petitioner removed some of Vanderson's property from the home, and after confessing to killing Vanderson, Petitioner took the police to various locations to show where he had concealed or destroyed the property.   (Id. at 574–75.)   The state alleged that Petitioner took the shell casing of the bullet used to kill Vanderson to his business where he destroyed it.   (Id. at 579.)   Finally, the state alleged that both Petitioner and Vanderson used illegal steroids, that Vanderson periodically provided Petitioner with steroids, and that a large amount of the drugs were found in Petitioner's van.   (Id. at 585.)

To support its case, the state offered the testimony of medical examiner Rebecca Hamilton who testified that Vanderson died from a single gunshot wound to the back of his head.   (Doc. 296-4 at 802–04.)   Dr. Hamilton also testified that, because of the lack of soot or stippling on Vanderson's body, the shot came from at least three feet away.   (Id. at 806–08.)

The state also offered a letter Petitioner wrote to the police (id. at 860–66, 916), in which he stated that he was "going to plead guilty in the murder of Ryan Silverstein [sic], who I shot execution style." (Id. at 922.)   In that letter, Petitioner invited the police to visit him so that he could help them collect evidence and show them the dump site and burn site of property removed from the crime scene.   (Id.)

Detective Lathrop testified that he interviewed Petitioner after receiving the letter.   (Doc. 296-5 at 994.)   Some of the recorded interview between Petitioner, Detective Lathrop, and another officer was played for the jury at trial.   (Id. at 1006–48.)[9]   During the interview, Petitioner told police that he became "fed up" with Vanderson who kept trying to sell him advertising even though he knew that Petitioner's air-conditioning company had been sold.   (Id. at 1009, 1010.)   He said that Melissa Alvarez told him that she would just "kill his ass," and that was "how it all started."   (Id. at 1011.)   Petitioner made the decision to kill Vanderson during the next "couple days."   (Id. at 1012.)   He drove to Vanderson's home, but he (Vanderson) did not answer the door, so Petitioner left a note asking him to call. (Id. at 1012–13.)   Thereafter, Petitioner made an appointment with Vanderson. (Id. at 1013.)   Petitioner said he brought bleach to the Vanderson home on the day of the murder to use as an accelerant and to drive "crime scene guys crazy."   (Id. at 1014.)   When Petitioner arrived at Vanderson's home, he saw that Vanderson had already drafted contracts for advertising.   (Id. at 1015)   Petitioner also saw a note

_____

[9] When played for the jury, portions of the interview were redacted because Petitioner also confessed to the unrelated homicide of Larrick Sikes during the interview.   See discussion infra Part III(I).

suggesting that Vanderson planned to meet with Petitioner's former business partner, Anne Marie Shields, later in the day.   (Id. at 1016.)   Petitioner explained and described the killing as follows:

> And I went out to the car and I said, "Melissa, this motherfucker's got AAA contracts already wrote the fuck out in there."   You know?   And then on a sheet of paper it says "Meeting with Ann Marie at 7:00 p.m."   She goes, "You got to just fucking kill his ass."   You know?   And she handed me the .45, I put it underneath my coat.   I had a sports coat on.   Put it underneath my coat and started walking into the house, and she followed me. And I had to walk through the front door and she followed right behind me. . . . And I raised up the pistol, I said, "Turn around."   He said, "What's the matter?"   I said, "I think you know what's the matter." And he turned around, I said "Kneel down," and he kneeled down and I shot him in the back of the head.

(Id. at 1017.)   Petitioner said that Vanderson "prayed as he knelt down."   (Id. at 1018.)

After shooting Vanderson, Petitioner filled a sprayer with bleach and sprayed it all over the house.   (Id. at 1019.)   Petitioner searched for, and found, the bullet near Vanderson's legs.   (Id.)   Ms. Alvarez found the bullet casing.   (Id. at 1020.) Ms. Alvarez rifled through Mrs. Vanderson's clothing, taking jewelry, a purse, and other items.   (Id. at 1021, 1027–28, 1034.)   Petitioner told the police that he took Vanderson's wallet, cell phone, and a bottle of Crown Royal, and Vanderson's cell phone.   (Id. at 1034–35.)   Petitioner then went to a gas station and filled a gas can. (Id. at 1022.)   Petitioner returned to Vanderson's home and poured gasoline on his body.   (Id. at 1023.)   Afterwards, Petitioner and Ms. Alvarez returned to their apartment and put their clothing in trash bags, along with Vanderson's briefcase.

(Id. at 1038.)   Petitioner said that he then threw the stolen jewelry and purse, along with some clothing, in a canal.   (Id. at 1042–43.)   He said that he smashed the recovered bullet casing with a rock and threw it in the rafters of the office of his air conditioning business.   (Id. at 1045–46.)

In addition to the medical examiner's testimony suggesting that Vanderson had been shot execution-style in the back of his head, the state presented evidence substantiating Petitioner's written and oral confessions.   After the interview, Petitioner took the police to locations referenced in the interview.   (Doc. 296-4 at 1056, 1060.)   At the burn site, the police recovered portions of a spiral notebook, pieces of a telephone book, pieces of jewelry and watches, and a belt buckle mixed in the fire debris.   (Id. at 1062.)   Divers were able to recover some of the victim's property from the canal.   (Id. at 1457–60.)   When the police searched Petitioner's van and Ms. Alvarez's car, they found a firearm, a checkbook, the victim's cell phone, identification cards from Vanderson's home, and ammunition.   (Id. at 1194–1201, 1210–13, 1253–56, 1321–23, 1330–31, 1334–35, 1340–42.)   Police found an Ohio State t-shirt and a wallet containing the victim's driver's license at Petitioner's home.   (Id. at 1440, 1445–46.)   The police also found a mangled portion of a bullet casing at Petitioner's place of business.   (Id. at 1265–68, 1269–71.)

Crime scene specialist Randolph Eubanks testified that the home smelled like gasoline and that there "was an accelerant trailer pour pattern" in Vanderson's bedroom.   (Id. at 1402.)   Mr. Eubanks smelled bleach throughout Vanderson's house.   (Id. at 1409–10.)   He also testified that nothing in the downstairs of the

victim's house was "knocked over or out of place," suggesting that no struggle had occurred.  (Id. at 1398, 1411.)   Detective Lathrop testified that Vanderson's garage and Ms. Alvarez's car smelled like household bleach and that the entire Vanderson house smelled like gasoline.   (Id. at 887, 888.)

Vanderson's wife, Tricia Vanderson, testified that nothing in the kitchen of her house was disturbed and that the furniture was as she left it when she left for work on the morning of the murder.  (Id. at 1598, 1605.)   She also testified that Vanderson's watch collection and some of her clothing were missing.  (Id. at 1602–04.)   She identified—as belonging to her or to her husband—items recovered from the dump sites and testified that Petitioner was wearing her husband's Ohio State t-shirt in a surveillance photograph taken at Walgreens soon after the murder.  (Id. at 1605–10, 1615.)   She testified that her husband sold steroids to Petitioner.  (Id. at 1611.)   He had also sold advertising to Petitioner in the past.  (Id. at 1613.)

As its last witness, the state offered testimony from Petitioner's former girlfriend and business partner, Anne Marie Shields.  (Doc. 296-4 at 1712–15.) Petitioner and Ms. Shields spoke by telephone several times while Petitioner was incarcerated in jail awaiting trial, and the conversations were recorded and played for the jury.  (Id. at 1716, 1723–36.)   In those recordings, Petitioner told Ms. Shields that his anger "just built up."  (Id. at 1724.)   He also explained that the police had no evidence against him because he removed the shell and shell casing from the house, sprayed the entire house with bleach, and set it on fire.  (Id. at 1725.)   He explained that he "went through painstakingly to make sure that [he]

left no trace of evidence that [he] was in the house.   To even removing the shell, you know?"   (Id. at 1726.)   He complained that Ms. Alvarez had been "standing there" when he shot Vanderson, but she inexplicably contacted the police.   (Id. at 1726–27.)   He told Ms. Shields that he had no regrets and enjoyed killing Vanderson because he was "a piece of shit.   And I shot him in the back of the fucking head, so—."   (Id. at 1731.)   He admitted that he worked to "cover up a murder scene."   (Id. at 1733.)   Ms. Shields testified that Petitioner was not concerned about speaking openly about the murder with her because he did not believe that the police would eavesdrop on his conversations.   (Id. at 1721–22.)[10]

The only evidence presented by the defense was the in-court testimony of Petitioner himself.   (Doc. 296-4 at 1808–1934.)   Petitioner testified that he initially met with Vanderson on the day of the murder to discuss advertising for a new company he planned to open and because Vanderson owed him some money.   (Id. at 1813–14.)   Petitioner said the conversation moved from advertising to steroids because Vanderson had recently borrowed $5000 from Petitioner.   (Id. at 1815.) Vanderson told Petitioner that he had ordered a large shipment of steroids, but had not received them.   (Id.)   They began to argue.   (Id. at 1816.)   Petitioner then saw a note suggesting that Vanderson planned to meet with Ann Marie Shields later that night.   (Id. at 1816.)   Petitioner said that he felt that Vanderson was "going

---

[10]   During closing argument, the state pointed out that there would have been no reason for Petitioner to fabricate a story about executing Vanderson to prove that he deserved the death penalty if he did not believe his conversations with Ms. Shields were being recorded.   (Id. at 2009-10.)

behind [his] back" and talking to Ms. Shields about his personal plans.   (Id. at 1818.)[11]   A physical altercation ensued.   (Id.)   During this fight, Vanderson put Petitioner's head under the kitchen sink faucet; in response, Petitioner pulled out a gun and accidentally fired a shot, causing Vanderson to release him.   (Id. at 1819–22.)   Thereafter, Vanderson "charged" at Petitioner; during an ensuing struggle, the gun fired, killing Vanderson.   (Id. at 1822–24.)

Petitioner testified that he "panicked" and attempted to make the crime scene look like a burglary.   (Id. at 1824–29.)   He denied spreading gasoline in the house, and testified that Ms. Alvarez returned to the house alone after the shooting and set the fire.   (Id. at 1827–35.)   He testified that he was an alcoholic and on many drugs—including Oxycodone, Xanax, Dilaudid, and cocaine—at the time he wrote the confession letter to the police, and as a result, he even didn't recall writing the letter.   (Id. at 1846, 1848, 1850, 1851.)   As to the other confessions, he claimed that he just wanted to seem terrible, had a death wish, and wanted Melissa Alvarez arrested.   (Id. at 1855, 1863, 1872, 1886, 1933.)

During closing argument, the state recounted Petitioner's confessions to the police and to Ms. Shields; but it also noted that, even without Petitioner's confessions and statements, there was a "wealth of evidence to proceed upon."   (Id. at 2017.)   The prosecutor pointed out the relationship between Petitioner and Vanderson; Petitioner's possession of Vanderson's property after the murder; DNA

---

[11] During the state's cross examination of Petitioner, the prosecutor suggested, as a motive for the murder, that Petitioner was jealous of Vanderson's relationship with Ms. Shields.   (Doc. 296-4 at 1914, 1930.)

evidence linking Petitioner to the murder weapon and to a Red Bull can in Vanderson's home; Petitioner's purchase of gasoline immediately after the murder; the convenient availability of a gas can in Petitioner's car; evidence that Petitioner intended to flee; and Petitioner's numerous inconsistent statements to the police and at trial.   (Id. at 2017–20.)   The state also pointed out that nothing in Vanderson's kitchen was disturbed or out of place, suggesting that no physical altercation ever occurred.   (Id. at 2058.)   In addition, although Petitioner had testified that the struggle with Vanderson was intense enough to knock out his tooth, when Petitioner was interviewed by the police only five days after the murder, there was no evidence that Petitioner had been involved in an altercation, specifically, "no bruising, there's no busted lip, there's no blood."   (Id. at 2054.)

Defense counsel (James Ermacora) argued in closing that, notwithstanding the state's evidence, none of it foreclosed Petitioner's version of events (that he killed Vanderson on accident or in self-defense).   (Id. at 2025–35.)   Mr. Ermacora also argued that Petitioner's detoxification from drugs caused him to say "bizarre" things in his calls to Ms. Shields.   (Id. at 2038.)

Notably, Petitioner had at least seven defense attorneys during the nineteen months between his arrest and the conclusion of his trial.   (See Doc. 296-3 at 965–66 (State's response to Petitioner's postconviction motion, listing Petitioner's representation history between November 8, 2010 and May 11, 2012).)   His representation by counsel was interspersed with periods where Petitioner conducted his own defense.   Petitioner proceeded to trial *pro se* on May 8, 2012; but the trial

court terminated his right to self-representation on May 11, 2012, after he physically attacked standby counsel James Ermacora.   (Doc. 296-4 at 1276.)   Mr. Ermacora, who had represented Petitioner during <u>some</u> of the pretrial proceedings and who was acting as standby counsel for trial, was then appointed as defense counsel for the remainder of trial and sentencing.   (<u>Id.</u> at 1310.)

Despite Petitioner's self-representation through much of the pretrial proceedings and trial, Petitioner raises ineffective assistance of trial counsel claims in his federal habeas petitions.   He raised many of the same claims in his Rule 3.850 Motion, and the postconviction court—recognizing the difficulty of parsing which ineffective assistance claims could actually be attributed to counsel (due to Petitioner's intermittent self-representation)—stated the following:

> As an initial matter, the Court recognizes that throughout pre-trial and trial proceedings Defendant waivered back and forth between being represented by counsel and self-representation, and that Defendant was representing himself when trial began and for a good portion of the trial until his own actions led to the appointment of counsel to finish the trial.
>
> As many of his claims below occurred during portions of the proceedings where he was proceeding pro se with an attorney as standby counsel, his claims of ineffective assistance directed towards standby counsel are inherently without merit. Standby counsel has no obligation to act on Defendant's behalf, because when proceeding pro se a "defendant who represents himself has the entire responsibility for his own defense, even if he has standby counsel, and cannot later claim that the quality of his defense was a denial of effective assistance of counsel." Behr v. Bell, 665 So. 2d 1055, 1056-1057 (Fla. 1996). Accordingly, his claims of ineffective assistance of standby counsel are hereby denied; however, the Court will further address each issue raised in Defendant's motion below.

(Doc. 296-3 at 1091–92 (citations to the record omitted and minor alterations made for clarity).)

The state court's rejection of any claim alleging ineffective assistance of standby (or *pro se*) counsel was neither contrary to clearly established federal law nor based upon an unreasonable determination of the facts.   "[A] defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of effective assistance of counsel." Faretta v. California, 422 U.S. 806, 834 n.46 (1975).   Therefore, any ineffective assistance claims raised in this habeas petition can only concern attorney conduct that "might have prejudiced [the petitioner's] right to a fair trial." United States v. Roggio, 863 F.2d 41, 43 (11th Cir. 1989).   In other words, Petitioner cannot now argue that he provided himself with a subpar defense, and any claim based upon alleged errors committed (or caused) by Petitioner or directed at the quality of representation provided by standby counsel are denied.   Nevertheless, the Court will address the merits of Petitioner's exhausted ineffective assistance claims to ensure that it addresses the periods when Petitioner was represented by counsel.   Specifically, for the claims raised in Petitioner's Rule 3.850 Motion, rejected by the postconviction court, and affirmed on appeal, this Court will "look through" the Second DCA's silent affirmance and consider the lower (postconviction) court's rationale for denying those claims.   See Sellers, 138 S. Ct. at 1192.

Finally, in Grounds 12, 13, 15, and 16 of the original petition, Petitioner raises ineffective assistance of trial counsel claims, but also asserts—with no

explanation—that he was denied effective assistance of appellate counsel for the same reasons.   (Doc. 1 at 20–24.)   The claims alleging ineffective assistance of appellate counsel were not raised in state court and are unexhausted.   Therefore, they must be dismissed.   Nevertheless, the claims alleging ineffective assistance of appellate counsel in Grounds 12, 13, 15, and 16 are also denied on the merits for the same reasons that his claims alleging ineffective assistance of trial counsel are denied.   28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

The timely claims in Petitioner's counseled third amended petition ("TAP") and each claim in his original petition ("OP") are discussed below.   In an attempt to avoid duplication of discussion, the Court has grouped and arranged the claims in the most logical manner possible.

### A.   Ground Four (TAP), Ground Five (TAP), Ground Fourteen (OP)

In Ground Four of the third amended petition, Habeas Counsel argues that Mr. Ermacora was constitutionally ineffective for failing to secure experts to testify at Petitioner's trial.   (Doc. 172 at 11.)[12]   Specifically, Habeas Counsel argues that testimony from a forensic crime scene expert and from mental health professionals would have ensured that the jury would not have convicted Petitioner of second-degree murder.   (Doc. 172 at 11–12.)   Habeas Counsel notes that Petitioner

---

[12] Notably, Mr. Ermacora was not called to act as counsel until the third day of trial, after Petitioner physically attacked him.   (Doc. 296-4 at 1276.)

confessed to police (by letter and in a recorded interview) and to a friend during several recorded telephone calls that he planned the murder of Vanderson and carried out that plan by shooting Vanderson execution-style in the back of his head. (Id. at 11.)   However, during trial, Petitioner testified that a fight broke out with Vanderson, and that "when the victim was holding [Petitioner's] head under water in the kitchen, [Petitioner] drew his gun to break the hold.   The struggle spilled into the dining room alcove where, during it, the gun fired again, this time hitting the victim."   (Id.)   Habeas Counsel argues that:

> [If Petitioner] had a forensic [crime] scene expert such as a Mr. Robinson (retained by present counsel) he would have noted the lack of bullet strike marks on the floor, adding that a bullet exiting the head would have not only left a strike mark but would have had so much force it would have penetrated floor tiles.   That disproves the kneeling, execution style shot.   Moreover, he would have brought up a fact noticed and documented by scene techs but never addressed by the State in its case, namely a bullet strike mark in the ceiling of the alcove above the body.   The bullet had been tumbling when it hit, indicating it had passed through an object before hitting the ceiling.   Additionally, this expert would testify that a likely scenario would be the shooter on the floor or below, with the victim above him, turning away as the shot went off.   More importantly, the expert would have mentioned another fact documented by investigators, but never revealed to the jury, namely that there were abrasions on the victim's left knuckles which occur typically as *offensive* marks.   That corroborates Mr. Casey's trial account and excludes his confession account.
>
> It would be hard to place much trust in the confession after that testimony, but a psychologist like Dr. DeClue (retained by present counsel) would have testified about Mr. Casey's circumstances and mental health history/status when he gave the confession and discussed voluntariness factors that could contribute to the jury's certitude of the unreliability of the confession.   With no reliance on the confession, and corroboration of Mr. Casey's trial account, no reasonable jury would have found Mr. Casey guilty of Second Degree Murder, especially when offered the lesser offense of Manslaughter (as occurred here).   Further expert evidence from a neuropsychologist like

Dr. Eisenstein (retained by present counsel) would have fleshed out his brain damage and the impact that has on his functioning and thought processes, bolstering the unreliability of the confession and explaining some of his peculiar behavior before the jury.

The outcome of the case would have been different for another reason. If Dr. DeClue had been appointed to evaluate voluntariness, he would have first performed a psychological evaluation; finding a history and present evidence of mental illness, he would have alerted counsel to that fact so as to ensure that a competency hearing could be done.   If a competency hearing were held, a neuropsychologist like Dr. Eisenstein would have found Mr. Casey mentally incompetent.

(Doc. 172 at 11–12.)   In Ground Five, Habeas Counsel argues that Mr. Ermacora "should have secured mental health and crime scene experts who would have provided powerful evidence to discredit the confession and support his client's trial account."   (Id. at 13.)[13]   Petitioner raised similar claims in Ground Fourteen of the original petition.   (Doc. 1 at 22.)

Petitioner raised these arguments in grounds nine and ten of his Rule 3.850 Motion, and the postconviction court denied them on both Strickland prongs.   The court noted that Mr. Ermacora was not ineffective for failing to seek psychiatric experts because "during a period of self-representation, Defendant raised this issue, and the Court denied his requests for medical experts without prejudice. Accordingly, as the Court already denied the motion, any adoptions by counsel

---

[13] In an earlier order, the Court found that all portions of Ground Five of the TAP were untimely, "except for the portions of Ground Five related to securing crime scene experts to discredit Petitioner's allegedly false confession . . . and the Second DCA's denial of his motions to provide an appendix in case number 2D14-174[.]"   (Doc. 288 at 21.)   Notwithstanding the earlier order, to the extent Petitioner argued in grounds nine and ten of his Rule 3.850 Motion that Mr. Ermacora should have also secured mental health experts to discredit Petitioner's confessions, the Court considers that portion of Ground Five as well.

would have been meaningless and ultimately moot; therefore, counsel was not
ineffective and Defendant was not prejudiced, as the Court heard and ruled on this
issue." (Doc. 296-3 at 1099.)   The postconviction court also concluded that
testimony from psychiatric experts would not have resulted in a different outcome
because Petitioner confessed his crimes both to the police and to his friend, Ann
Marie Shields, and "[t]he existence of his multiple confessions given at different
times demonstrates that there is no reasonable probability that the outcome of the
trial would have been different had counsel arranged for [psychiatric] witnesses."
(Id.)

Similarly, when considering Petitioner's argument that Mr. Ermacora should
have called a crime scene expert to testify about whether the crime scene was
consistent with Petitioner's confessions, the postconviction court once again pointed
to Petitioner's multiple confessions and found no reasonable probability of a
different outcome had such an expert testified. (Doc. 296-3 at 1098.)   The
postconviction court also noted that any claim that such an expert would have
supported Petitioner's trial testimony was "speculative and conclusory in nature
[and] [p]ostconviction relief cannot be based on speculation or possibility." (Id. at
1099) (citing Maharaj v. State, 778 So.2d 944, 951 (Fla. 2000).)   The Second DCA
affirmed without a written opinion. (Doc. 186-3 at 135.)

Petitioner does not show how the state courts' rejection of these claims "was
contrary to, or involved an unreasonable application of" Strickland or "resulted in a
decision that was based on an unreasonable determination of the facts in light of

the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).   While

he argued in his Rule 3.850 Motion that Mr. Ermacora was ineffective for failing to

move for and secure expert witnesses, Petitioner did not offer the postconviction

court any testimony or reports from these experts.   And, as noted by the

postconviction court, Petitioner's mere speculation that expert witnesses might have

testified as he alleged was insufficient to show prejudice under Strickland.   See

Jones v. State, 845 So. 2d 55, 64 (Fla. 2003) ("Postconviction relief cannot be based

on speculative assertions."); Tejada v. Dugger, 941 F.2d 1551, 1559 (11th Cir. 1991)

(recognizing that vague, conclusory, speculative, or unsupported claims cannot

support an ineffective assistance of counsel claim).   After careful review of the

record before the state courts, Petitioner has not demonstrated that no "fairminded

jurist" could have concluded that Petitioner did not meet his burden of showing

prejudice from Mr. Ermacora's alleged failure to secure experts to testify at trial

after he was unexpectedly appointed as counsel mid-trial.   Harrington, 562 U.S. at

102.

     As part of the third amended petition, Habeas Counsel now offers this Court

expert testimony that could have been (but was not) presented to the state

postconviction court during the postconviction proceedings.   Habeas Counsel

argues that Petitioner was not at fault for failing to provide this evidence to the

state court during postconviction proceedings because he could not afford to do so.

(Doc. 303 at 3–4.)   However, consideration of evidence offered for the first time on

federal habeas review is foreclosed by Supreme Court precedent establishing that

"review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." Pinholster, 563 U.S. at 181.

Habeas Counsel argues that in Martinez v. Ryan, 566 U.S. 1 (2012), the "Supreme Court held that a defendant without counsel in postconviction proceedings may not be able to secure such evidence or adequately plead ineffectiveness of counsel, and so could be excused from not presenting such evidence in state court." (Doc. 303 at 5 (citing Martinez, 566 U.S. at 16–17).) However, this argument is not supported by current law for two reasons.   First, Martinez stands for the proposition that, in certain limited circumstances, a petitioner should be allowed to raise substantial unexhausted ineffective assistance of counsel claims for the first time on habeas corpus review.   Id. at 1318–19.   But, as noted above, the instant claim is not unexhausted.   Petitioner raised it in his Rule 3.850 Motion where he had an opportunity to develop the record (but did not do so), and the claim was denied by the postconviction court in a considered opinion. Next, the Supreme Court has recently explained that Martinez does not excuse "a prisoner's failure to develop the state-court record under § 2254(d)(2)."   Shinn v. Ramirez, 142 S. Ct. 1718, 1736 (2022).   Rather, the Shinn Court expressly rejected the petitioner's request to extend Martinez to allow prisoners to expand the state court record to develop defaulted ineffective assistance claims in federal habeas court.   Id. at 1737–38.   The Court determined that "under § 2254(e)(2), a federal habeas court may not conduct an evidentiary hearing or otherwise consider evidence beyond the state-court record based on ineffective assistance of state

postconviction counsel." Id. at 1734.[14]   And Shinn did not exempt indigent

prisoners from the requirement that they fully develop the record in state court.

The state courts' rejection of these claims on the ground that Petitioner had

not met his burden of demonstrating prejudice was neither contrary to clearly

established federal law nor based upon an unreasonable determination of the facts

in light of the state court record.   And because a petitioner must prove both

Strickland prongs to show entitlement to federal habeas relief, this Court will not

consider whether Petitioner or Habeas Counsel has demonstrated deficient

performance.   Grounds Four and Five of the third amended petition and Ground

Fourteen of the original petition are thus denied.

### B.    Ground Five (TAP), Ground Nine (OP)

It is difficult to discern the precise claims raised by Habeas Counsel in

Ground Five of the third amended petition or by Petitioner in Ground Nine of the

original petition regarding an allegedly incomplete record.   However, it is clear

that they are not the same claim.   In Ground Five of the third amended petition,

Habeas Counsel argues, in a conclusory manner, that trial counsel was ineffective

for failing to ensure that Petitioner received a complete record on appeal.   (Doc. 172

at 13.)   When initially reviewing the third amended petition for timeliness, this

---

[14]   Section 2254(e)(2) provides that if the petitioner did not develop the factual basis of the claim in state court, this Court may not hold an evidentiary hearing on the claim unless the claim relies on "new rule of constitutional law, made retroactive to cases on collateral review" or "a factual predicate that could not have been previously discovered through the exercise of due diligence[.]"   28 U.S.C. § 2254(e)(2).   Neither exception applies here.

Court allowed this claim to proceed on the ground that "Petitioner's only non-speculative claim of an incomplete record is his assertion that he did not receive a complete appendix from the state in case number 2D14-174."   (Doc. 288 at 21.) But the Court also clarified that the "incomplete record" claim raised in Ground Five of the third amended petition was timely only "to the extent the allegations raised in Ground Five are the same as those raised in Grounds Nine and Fourteen of the original complaint."   (Id. at 22.)   And a further review of the pleadings shows that Ground Five of the third amended petition raises only an ineffective assistance of <u>trial</u> counsel claim for failing to "ensure a complete record on appeal." (Doc. 172 at 13.)   But Ground Nine of the original petition alleges prosecutorial misconduct during postconviction proceedings and faults the state for failing to provide Petitioner with a more complete record for his state habeas petition alleging ineffective assistance of <u>appellate</u> counsel.   (Doc. 1 at 15–16.)[15]

The ineffective assistance claim raised in Ground Five of the third amended petition does not relate back to the claims raised in the original petition, and it must be dismissed as untimely as explained in the Court's January 18, 2023 Order dismissing all claims in the third amended petition except for those relating back to the original petition.   (See Doc. 288 at 21 ("[E]xcept to the extent the allegations

---

[15] The Court's conclusion that Habeas Counsel and Petitioner raise different claims is supported by dates on the pleadings.   The Second DCA denied Petitioner's direct appeal on October 18, 2013.   Casey v. State, 124 So. 3d 923 (Fla. 2d DCA 2013).   Petitioner sought a better (more complete) copy of the appendix, through a "motion to compel" dated June 6, 2014—long after the conclusion of direct appeal. (Doc. 293-3 at 907.)

raised in Ground Five are the same as those raised in Grounds Nine and Fourteen of the original complaint, Ground Five is dismissed as untimely").)

Petitioner fares no better in Ground Nine of the original petition where he alleges that he was not provided a complete record to use for his <u>state habeas petition</u> alleging ineffective assistance of appellate counsel. The writ of habeas corpus under 28 U.S.C. § 2254 "was not enacted to enforce State-created rights." Cabberiza v. Moore, 217 F.3d 1329, 1333 (11th Cir. 2000). Therefore, when, as here, a petitioner asserts an error in state postconviction procedures, relief cannot be granted in federal habeas corpus. See Spradley v. Dugger, 825 F.2d 1566, 1568 (11th Cir. 1987) (holding that when a petitioner's claim goes to issues unrelated to the cause of his detention, that claim does not state a basis for habeas relief); Quince v. Crosby, 360 F.3d 1259, 1261–62 (11th Cir. 2004) (recognizing that "while habeas relief is available to address defects in a criminal defendant's conviction and sentence, an alleged defect in a collateral proceeding does not state a basis for habeas relief"); Nichols v. Scott, 69 F.3d 1255, 1275 (5th Cir. 1995) ("An attack on a state habeas proceeding does not entitle the petitioner to habeas relief in respect to his conviction, as it is an attack on a proceeding collateral to the detention and not the detention itself.") (internal quotes omitted).

Here, Petitioner has not presented an issue that is cognizable on federal habeas corpus review because he is complaining about an alleged defect in a collateral proceeding—the failure of the state to provide a complete record for his state habeas petition. This does not state a claim for federal habeas relief, Quince,

360 F.3d at 1261–62, and Petitioner is not entitled to relief on Ground Nine of the original habeas petition.

## C.   Ground Six (TAP)

In Ground Six of the third amended petition, Habeas Counsel alleges that the trial court's denial of Petitioner's request for expert witnesses was unreasonable under Ake v. Oklahoma, 470 U.S. 68 (1985).[16]   Habeas Counsel argues that Petitioner sought the appointment of experts at least 11 times before trial and reminded the judge that he needed a ruling on those motions in "an additional 20 instances" but the requests were denied.   (Doc. 172 at 15.)   Habeas Counsel recognizes that this ground is both untimely and unexhausted, but faults Petitioner's mental illness, severe brain damage, and incompetency for the failure to exhaust.   (Id.)   Habeas Counsel also argues that the state should be estopped from raising untimeliness now because Respondent did not discuss the timeliness of this claim in its initial response to the third amended petition.   (Doc. 303 at 13.)

Indeed, in the initial response to the counseled third amended petition, Respondent did not argue that Ground Six was untimely, concede that Ground Six was timely, or expressly waive an untimeliness defense on this claim; rather, the response simply did not mention Ground Six at all.   (Doc. 185.)   In turn, this Court overlooked Ground Six in its order requiring Respondent to file an answer.   (Doc.

---

[16]   In Ake, the Supreme Court held that the Due Process Clause of the Fourteenth Amendment requires the state to provide a psychiatric evaluation to an indigent criminal defendant if he needs it.   470 U.S. at 86–87.

288.)   However, as explained below, the Court does not find that the State's failure to argue untimeliness in its first response forecloses it from doing so now.

Upon consideration of the state's initial response, and taking it in light of the extensive history of this case—including the thousands of pages of documents filed by Petitioner and Habeas Counsel during the last eight years—the Court finds nothing to suggest that the omission of Ground Six from the State's initial response to the third amended petition was deliberate or that "the State knew it had an 'arguable' statute of limitations defense . . . yet it chose, in no uncertain terms, to refrain from interposing a timeliness 'challenge' to [Petitioner's] petition." Wood v. Milyard, 566 U.S. 463, 474 (2012).   Rather, it appears that the omission of this claim from the response to the third amended petition was simply an error—not an intelligent waiver on the state's part.   Therefore, the Court will consider whether Ground Six is time-barred.   See Day v. McDonough, 547 U.S. 198, 199, 210-11(2006) (holding that in the case of an "inadvertent error" or miscalculation (rather than a deliberate waiver by the state), a district court has discretion to "determine whether the interests of justice would be better served by addressing the merits or by dismissing the petition as time barred") (internal quotations omitted).

After carefully reviewing each of the eighteen claims raised in Petitioner's timely *pro se* petition (see Doc. 288 at 5–6 (summarizing and listing Petitioner's claims)), the Court concludes that this unexhausted claim of trial court error must be dismissed as untimely because it does not relate back to any of those claims. (See Doc. 288 at 10–18 (concluding that Petitioner's counseled third amended

petition (Doc. 1) was untimely, and noting that "most of the claims in the amended petitions do not relate back to the timely pro se petition").)   Accordingly, Ground Six of the third amended petition is dismissed as untimely filed.

Even if the Court were to conclude that Ground Six was timely filed or that Respondent waived a timeliness argument, Petitioner did not raise this claim of trial court error (or any <u>Ake</u>[17] claim) on direct appeal, leaving it unexhausted.   See <u>Sampson v. State</u>, 845 So. 2d 271, 272 (Fla. 2d DCA 2003) (holding that claims of trial court error should be raised on direct appeal).   While recognizing that the claim is unexhausted, Habeas Counsel argues that the default should be excused under <u>Martinez v. Ryan</u>.   (Doc. 154-1 at 15.)   However, <u>Martinez</u>'s narrow exception to the procedural default doctrine for claims asserting the ineffective assistance of trial counsel does not apply to claims of trial court error.   See <u>Gore v. Crews</u>, 720 F.3d 811, 816 (11th Cir. 2013) ("By its own emphatic terms, the Supreme Court's decision in <u>Martinez</u> is limited to claims of ineffective assistance of trial counsel that are otherwise procedurally barred . . . .").

Habeas Counsel also argues that Petitioner's mental illness, brain damage, and incompetence should excuse his failure to exhaust his remedies in state court. (Doc. 154-1 at 15.)   But Petitioner was represented on direct appeal by appellate counsel who did not argue that the trial court's denial of Petitioner's expert requests contravened <u>Ake</u>.   Petitioner does not explain how his mental illness prevented appellate counsel—who was presumably aware of the trial court's rulings on

---

[17] <u>Ake v. Oklahoma</u>, 470 U.S. 68 (1985).

Petitioner's motions for experts—from complying with the state's procedural rules and raising this claim.  See Murray, 477 U.S. at 488 (finding "no inequity in requiring [Petitioner] to bear the risk of attorney error that results in a procedural default"); Bingham v. Warden, No. 16-13085-B, 2017 WL 11812478, at *8 (11th Cir. May 1, 2017) ("To the extent that [Petitioner] argues that his mental illness was cause for the procedural default, he does not explain how his mental illness prevented him from complying with the state's procedural rules.").  And although ineffective assistance of appellate counsel can provide cause for the procedural default of a claim of trial court error, the underlying ineffective assistance of appellate counsel claim must be independently exhausted before it can be used to establish cause for a procedural default.  See Edwards v. Carpenter, 529 U.S. 446, 451–52 (2000) ("[I]neffective assistance adequate to establish cause for the procedural default of some other constitutional claim is itself an independent constitutional claim," which must "be first raised in state court . . . as an independent claim before it may be used to establish cause for a procedural default.") (emphasis in original) (internal citations and quotation omitted). Petitioner raised fourteen claims in his state habeas petition alleging ineffective assistance of appellate counsel (Doc. 296-3 at 788–809), but none of those claims can be liberally construed to allege, or even suggest, that appellate counsel was constitutionally ineffective for failing to argue on direct appeal that the trial court's denial of Petitioner's expert requests "was based on an unreasonable determination of the sufficiency of his motions, contravening Ake[.]"  (Doc. 172 at 15.)   In

addition to being dismissed as untimely, Ground Five of the third amended petition is also subject to dismissal as unexhausted.

### D.    Ground One (OP)

In Ground One of his original petition, Petitioner raises several claims of ineffective assistance of appellate counsel.  (Doc. 1 at 4–5.)   Petitioner asserts that he did not have sufficient time to consult with appellate counsel and that counsel "refused to file a legally sufficient direct appeal."   (Id.)   Most of Ground One centers on Petitioner's belief that large portions of his trial transcript or other state records were altered so as to "hide fundamental errors and the trial court misconduct."   (Id. at 5.)   In this petition, Petitioner directs the Court to grounds eight and twelve of his state habeas corpus petition.   (Id.)   Therefore, the Court assumes, except as noted, that Ground One now raises the same claims as alleged in grounds eight and twelve of Petitioner's state habeas petition.[18]

In ground eight of his state habeas petition, Petitioner argued that the dates on several pretrial hearings were altered "to insulate the State from speedy trial violations."   (Doc. 293-3 at 797.)   He also asserted that the trial court's response to Petitioner's request for a Richardson hearing was changed in the records.   (Id.)[19]

---

[18] Petitioner did not argue in grounds eight and twelve of his state habeas petition, or anywhere else in his state habeas petition, that he had inadequate time to consult with appellate counsel.   (See Doc. 296-3 at 788–809.)   Accordingly, to the extent that this claim is distinct from the other claims and allegations raised in Petitioner's state habeas petition, it is subject to dismissal as unexhausted.

[19] In Richardson v. State, 246 So. 2d 771 (Fla. 1971), the Florida Supreme Court held that when there is a reason to believe that an opposing party has not complied with discovery order, a party can request a hearing to determine whether there has been a violation of the discovery rules.   Id. at 776.

Petitioner described several alleged instances of altered transcripts and stated that he sent appellate counsel numerous "letters and requests concerning these transcripts.   However, [appellate counsel] refused to challenge the record."   (Doc. 293-3 at 798.)

In ground twelve of his state habeas petition, Petitioner asserted that he "mailed countless letters to [appellate counsel] requesting that all claims raised [in his state habeas petition] be raised on appeal."   (Id. at 802.)   He argued that appellate counsel refused to raise those claims and speculated that appellate counsel failed to do so and requested extensions of time so that none of those responsible for altering the state-court record could be "criminally charged with evidence and witness tampering, which said charges would have been enhanced because of the severity of the charges faced by the defendant."   (Id. at 802–03.) Petitioner once again asserted that appellate counsel "failed to ensure a complete appellate record to include all pretrial, trial, and post-trial motions" (id. at 803), presumably the motions that would have supported Petitioner's claims of witness tampering and transcript alterations.

Petitioner's claims of witness tampering and transcript alteration by the state judiciary, law enforcement, prosecutors, and defense counsel could, if proven, rise to the level of a due process violation.   See United States v. Mulherin, 710 F.2d 731, 735 (11th Cir. 1983) ("Government involvement in criminal schemes can be so outrageous that it offends due process.").   However, the Court reiterates that Petitioner has the burden of proof on federal habeas review.   Wong, 558 U.S. at 27.

Therefore, to the extent he alleges that appellate counsel was ineffective for failing to discover or present evidence of record tampering, witness tampering, or other illegal acts from the state on direct appeal, Petitioner must offer evidence to support this habeas claim.   And he has not done so.   Petitioner does not offer proof of tampering (nor did he do so in state court), and the complete absence of evidence that the state court record was actually altered leaves this claim factually unsupported.   Therefore, any ineffective assistance claims based upon appellate counsel's failure to discover altered records and to provide Petitioner with copies thereof must be denied.   Mere speculation that favorable evidence may exist is insufficient to show either deficient performance or prejudice under Strickland. See Jones, 845 So. 2d at 64; Chandler v. United States, 218 F.3d 1305, 1314 n.15 (11th Cir. 2000) ("An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption [of counsel's competence]."); Tejada, 941 F.2d at 1559.

Even if Petitioner's claims of a widespread conspiracy to deprive him of his constitutional rights (through witness tampering, record deletion, and transcript alteration) were supported by the record and nonfrivolous—a finding not made by this Court—there is no per se rule that appellate counsel must raise every nonfrivolous issue requested by a client.   In Jones v. Barnes, the Supreme Court considered, and rejected, this very argument.   463 U.S. 745 (1983).   The Supreme Court explained that a defendant does not have "a constitutional right to compel appointed counsel to press nonfrivolous points requested by the client, if counsel, as

a matter of professional judgment, decides not to present those points." Id. at 751. "Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." Id. at 751–52. In other words, Petitioner can show deficient performance on Ground One only if no competent appellate counsel would have decided against raising the omitted claims on direct appeal.

In the brief on direct appeal, appellate counsel raised a two-part argument that the trial court committed fundamental and reversible error by offering faulty and incomplete jury instructions on second-degree murder and manslaughter. (Doc. 296-3 at 733–57.) And given the complete lack of factual support for the omitted claims at issue in Ground One, reasonable appellate counsel could have chosen to focus on presenting a legal argument on jury instructions instead of raising unsupported claims of widespread corruption. See Alvord v. Wainwright, 725 F.2d 1282, 1291 (11th Cir. 1984) (recognizing that appellate counsel is not ineffective for failing to raise claims "reasonably considered to be without merit").

To the extent Ground One is based on the same claims raised in grounds eight and twelve of Petitioner's state habeas petition, the Court finds that he has not met his burden on either Strickland prong, and the Second DCA's rejection of this claim was neither contrary to clearly established federal law nor based upon an unreasonable determination of the facts, and the claim is denied. And any argument raised in Ground One that was not presented in state court is dismissed as unexhausted. Petitioner is not entitled to federal habeas relief on Ground One.

### E.   Ground Two (OP)

Petitioner asserts that John Lathrop, the detective who investigated Ryan Vanderson's murder, committed perjury when he testified about Petitioner's Miranda rights.[20]   (Doc. 1 at 6.)   He claims that a Giglio[21] violation occurred because Detective Lathrop lied about his location relative to Petitioner when Petitioner was read his Miranda warnings by a different detective, and the state then "changed the trial transcripts to hide the errors."   (Doc. 1 at 6.)   These claims are based on Petitioner's belief that an "unredacted interrogation video" exists and that the State engaged in a cover-up by either altering transcripts of his interrogation or altering transcripts from a pre-trial hearing.   He faults appellate counsel for not including this claim in his brief on direct appeal.   (Id. at 7.)

Petitioner raised this claim as ground one of his state habeas petition. There, Petitioner argued that Detective Lathrop's trial and evidentiary hearing testimony differed as to whether he was in the same room when Petitioner was read his Miranda rights (trial testimony) or whether he watched Detective Brown read the rights via closed-circuit television from a different room (hearing testimony). Petitioner complained that he was not allowed to impeach Detective Lathrop with

---

[20] Miranda v. Arizona, 384 U.S. 436 (1966) (holding that any statements made by a defendant in custody during a custodial interview are admissible only if law enforcement told the defendant of his right to remain silent and right to speak with an attorney before the interrogation and the rights were either exercised or waived in a knowing, voluntary, and intelligent manner).

[21] Giglio v. United States, 405 U.S. 150, 153–54 (1972) (holding that a due process violation occurs when evidence reveals that the prosecution knowingly made false statements or introduced or allowed trial testimony that it knew or should have known was false if the information was "material").

this inconsistency.   (Doc. 296-3 at 791.)   The Second DCA denied the claim without a written opinion.   (Id. at 790, 911.)

Petitioner has not demonstrated that the state court's denial of this claim entitles him to habeas relief.   First, as discussed supra, Petitioner presents no evidence showing that any transcripts were altered so as to hide trial court errors or police misconduct, and appellate counsel was not ineffective for failing to argue otherwise.   Next, to prove a Giglio claim, Petitioner would have to prove that the prosecutor used perjured testimony and that the false testimony could have affected the judgment.   Giglio, 405 U.S. at 153–54.   Petitioner has proven neither.

Notably, Petitioner does not argue that he was not read his Miranda rights or that the detective lied about seeing Petitioner being read those rights; rather, this claim is based solely upon an alleged disparity in Detective Lathrop's pretrial and trial testimony about his relative proximity to Petitioner while those rights were read.   Reasonable competent appellate counsel could have concluded that this minor disparity did not show that Detective Lathrop committed perjury.   See United States v. Stein, 846 F.3d 1135, 1149 (11th Cir. 2017) ("[I]t is well-established that a prior statement that is merely inconsistent with a government witness's testimony is insufficient to establish prosecutorial misconduct.") (internal quotation omitted); Hays v. State of Alabama, 85 F.3d 1492, 1499 (11th Cir. 1996) (holding that there was no due process violation arising out of a witness's inconsistent testimony where there was "no showing that [the witness's] later, rather than earlier, testimony was false").

Additionally, there was no dispute that Petitioner caused the death of Ryan Vanderson or that Petitioner received <u>Miranda</u> warnings.   Even had Petitioner "impeached" Detective Lathrop with the conflict at issue here, this testimony was not material to determine any issue at trial.[22]   Therefore, reasonable competent appellate counsel could have decided against raising a <u>Giglio</u> claim on direct appeal because Petitioner's inability to raise this inconsistency at trial did not have a "substantial and injurious effect or influence in determining the jury's verdict."   See <u>Trepal v. Sec'y, Fla. Dep't of Corr.</u>, 684 F.3d 1088, 1112 (11th Cir. 2012) (applying the harmless error test to <u>Giglio</u> claims on federal habeas review).

The Second DCA's rejection of this claim was neither contrary to clearly established federal law nor based upon an unreasonable determination of the facts.  Petitioner is not entitled to federal habeas relief on Ground Two of the original petition.[23]

---

[22]  Petitioner does not claim otherwise.   Rather, he argues that he killed Ryan Vanderson during a struggle and that the killing was not second-degree murder.   (See Doc. 296-4 at 1815–24; summary <u>supra</u> Part III.)   But Petitioner does not argue that Detective Lathrop misrepresented Petitioner's words during the confession; rather, he claims that he (Petitioner) lied to the police about what had actually happened—hoping to receive the death penalty.   (Id. at 1933.)   It is unclear how Detective Lathrop's inconsistency regarding his location when Petitioner received <u>Miranda</u> warnings could have "impeached" the detective in such a way that it had a bearing on the jury's verdict.

[23]  In Grounds Two, Three, Five, Six, and Eleven of the original petition, Petitioner types or handwrites in the margins, with no explanation, "5th Amend. Double jeopardy."   (Doc. 1 at  3, 6, 9, 10, 12, 19.)   The Court's review of the lengthy state-court record does not uncover any postconviction pleadings where Petitioner raised a Double Jeopardy Clause claim, and as a result, this portion of these claims must be dismissed as unexhausted.   Nevertheless, given the lack of factual development of a Fifth Amendment or Double Jeopardy claim—here or in state court—these claims are also dismissed on the merits because Petitioner has

## F.     Ground Three (OP)

Petitioner asserts that the jury was not sworn in and that "[t]he jurors admitted they were not sworn in upon questioning by shaking their heads 'no.'" (Doc. 1 at 7.)   He asserts that he spoke this into the record, but the state omitted these exchanges from the trial transcripts.   (Id.)   He asserts that appellate counsel was ineffective for failing to include this claim in his brief on direct appeal.   (Id. at 8.)   Petitioner raised this claim as ground two of his state habeas petition, and the Second DCA denied it without a written order.   (Doc. 296-3 at 911.)

Petitioner has not demonstrated that the state court's denial of this claim entitles him to habeas relief, and his allegations are refuted by the trial transcript. Before the jury was brought in, the prosecutor told the court that "based on some objections yesterday[,] would the Court inquire of the jury or the appropriate personnel that the prospective jurors were sworn, properly sworn before the jury selection yesterday, so there's a record of that [.]"   (Doc. 296-4 at 543.)   Thereafter, the jury was brought into court, and the judge asked them whether they "were sworn by the clerk before you came up here; is that correct?"   (Id. at 545.)   The court then noted, "Yes, okay."   (Id.)   Thereafter, Petitioner objected, arguing that "the jury wasn't sworn in for voir dire yesterday."   (Id. at 552.)   The following exchange occurred:

> COURT.            They were sworn in downstairs, sir.

not met his burden of showing entitlement to federal habeas corpus relief.   See 28 U.S.C. § 2254(b)(2).   They will not be further addressed in this Order.

| PETITIONER. | Well, you asked them that and Mr. Ramos shook his head no. |
|---|---|
| COURT (to juror). | Were you addressed by a clerk and were you sworn in downstairs? |
| JUROR. | This morning?   No. |
| COURT. | No.   Yesterday? |
| JUROR. | Oh, yes.   I'm sorry, I thought you said this morning. |
| COURT. | Your objection is – your is [sic] objection denied.   Thank you. |

(Id.)   Given the lack of factual support for this claim, reasonable competent appellate counsel could have decided against raising it on direct appeal, and the state court's rejection of the claim was neither contrary to clearly established federal law nor based upon an unreasonable determination of the facts.[24]   Ground Three is denied.

### G.    Ground Four (OP)

Petitioner asserts that appellate counsel was ineffective for "failing to supplement the record with motions to disqualify and raise judicial bias on appeal." (Doc. 1 at 8.)   Petitioner states that these are the same claims of judicial bias that he raised in portions of grounds six and eleven of his state habeas petition.   (Id.) In those grounds, Petitioner asserted that he had filed "many legally sufficient motions to disqualify the trial judge," had filed a petition for writ of habeas corpus

---

[24] To the extent Petitioner now argues that the record was altered, he presents no evidence showing as much, and appellate counsel was not ineffective for failing to argue otherwise.   See Tejada, 941 F.2d at 1559; see also discussion supra Ground One (OP), Part III(D).

alleging witness tampering, and had filed a petition for writ of prohibition directed towards the trial judge.   (Doc. 296-3 at 796 (ground six), 801–02 (ground eleven)).[25]

In its response brief to Petitioner's state habeas petition, the state addressed these assertions, arguing:

> The record in this case reflects that Petitioner filed approximately 19 pro-se written motions to disqualify or recuse Judge Volz from presiding over his case.   The vast majority of these pro-se disqualification motions were written while Petitioner was represented by various counsel.   None of these counsel adopted Petitioner's motions.   Only one lawyer, Richard Watts, who represented Petitioner briefly during August, 2011, filed any motion directed at Judge Volz.   This motion did not adopt claims of bias or conspiracy, but rather addressed the court's decision regarding Petitioner appearing shackled and in prison dress during various pre-trial hearings.
>
> Petitioner, who was alternatively represented by counsel and appearing pro-se, [] repeatedly asserted pro-se that Judge Volz was denying his right to a fair trial on various bases, including colluding with the State and being complicit in the falsification of the record.   Although many of the motions were denied as legally insufficient, nearly all could properly have been, and many were, denied as nullities, since they were filed pro-se while Petitioner was still represented by counsel.

(Doc. 296-3 at 829–30 (footnote and citations to the record omitted).)   Petitioner's state habeas claims were denied without comment by the Second DCA.   (Id. at 911.)

Petitioner has not shown that there was no sound reason for the Second DCA to deny this claim.   Specifically, Petitioner does not provide this Court with the

---

[25] The Court has carefully reviewed grounds six and eleven of Petitioner's state habeas petition.   (Doc. 296-3 at 795–96, 801–02.)   The grounds appear to be directed towards *pro se* motions filed during the pretrial and trial proceedings, but are, for the most part, unintelligible.

allegedly missing *pro se* motions to disqualify, and this claim is subject to dismissal as insufficiently pleaded for that reason alone.   Simply put, the Court will not speculate as to which of the hundreds of *pro se* motions filed in his underlying criminal case are at issue in this ground.   See Chavaz v. Sec'y, Fla. Dep't of Corr., 647 F.3d 1057, 1061 (11th Cir. 2011) ("Making district courts dig through volumes of documents and transcripts would shift the burden of sifting from petitioners to the courts. With a typically heavy caseload and always limited resources, a district court cannot be expected to do a petitioner's work for him.").   Moreover, Petitioner admits that these were *pro se* motions, and does not disagree that "the vast majority" of them were written while he was represented.   It is well settled that "a defendant has no Sixth Amendment right to simultaneously proceed *pro se* and with legal representation."   Sheppard v. State, 17 So. 3d 275, 279 (Fla. 2009).

Therefore, in most cases, "any *pro se* motion filed by a represented party is . . . a nullity."   Smith v. State, 21 So. 3d 72, 74 (Fla. 1st DCA 2009).   As such, appellate counsel had no grounds to appeal the *pro se* motions to disqualify Judge Volz made while Petitioner was represented and was not ineffective for failing to do so.   See United States v. Nyhuis, 211 F.3d 1340, 1344 (11th Cir. 2000) ("Appellate counsel is not ineffective for raising claims 'reasonably considered to be without merit.'") (quoting Alvord v. Wainwright, 725 F.2d 1282, 1291 (11th Cir. 1984)).

Petitioner attempts an end run around this inevitable conclusion by arguing that appellate counsel was constitutionally ineffective—not for failing to appeal the rejections of his motions to disqualify—but for failing to supplement the record with

his *pro se* motions to disqualify.   But this argument is illogical—there would be no need to supplement the record with Petitioner's *pro se* motions if they were not at issue in the appeal.   In other words, Petitioner must show that the motions were both properly filed <u>and</u> meritorious before appellate counsel's duty to appeal their rejection is even implicated.

Finally, the Court has reviewed the entire state record that was provided by Respondent (Doc. 296-1–296-4), including Petitioner's trial transcript.   (Doc. 296–4).   The record shows that the trial court (Judge Volz), all of Petitioner's seven defense attorneys, and the prosecutor attempted to accommodate Petitioner as he proceeded *pro se* in this matter.   Judge Volz was courteous to Petitioner at all times, entertained his numerous *pro se* motions when they were properly filed, granted Petitioner the right to self-representation, and only removed that right when Petitioner retained new counsel or when he physically attacked his standby counsel during trial.   Nothing in the record suggests that no reasonable appellate counsel would have failed to appeal the denial of Petitioner's requests to disqualify Judge Volz.   The Second DCA's denial of Ground Four was neither contrary to <u>Strickland</u> nor based upon an unreasonable determination of the facts, and the claim is denied.

## H.    Ground Five (OP)

In Ground Five, Petitioner appears to assert that the videotape of his November 2, 2010 interrogation and confession was inadequately authenticated. (Doc. 1 at 9.)   He asserts that "[t]he Defendant's reply to detectives on page 117 of preliminary transcripts, 'Thank you' would have established quid pro quo, coercive

questioning with promises within the context.   This statement was removed from the video."   (Id. at 9–10.)   He faults appellate counsel for failing to raise this claim on direct appeal.   (Id. at 10.)   Petitioner raised this issue as ground three of his state habeas petition (Doc. 296-3 at 792–93), and it was rejected by the Second DCA without a written opinion.   (Id. at 911.)

Petitioner has not demonstrated entitlement to habeas relief.   His concern appears directed at the admission of a video showing his November 2, 2010 interview with Detectives Lathrop and Brown that included his detailed confession to murdering Ryan Vanderson.   He argues that the video was improperly authenticated.   Before playing it for the jury, the state questioned Detective Lathrop about the tape's authenticity:

> Q.   Showing you what's been marked State's Exhibit 201.   I'd ask if you recognize the disk that's in this envelope.
>
> A.   Yes, sir.   Yes, sir.   This is Exhibit 201, it's the disk that I reviewed on May 9th, 2012, and initialed that I reviewed it.
>
> Q.   And is this the relevant portion of that as to Ryan Vanderson's homicide case?
>
> A.   Correct.   That's a copy of the interviews from November 2nd.
>
> Q.   And when you reviewed this on May 9th this week, did it fairly and accurately depict the questions and responses of the defendant that occurred on November 2nd, 2010, at the headquarters of the Lee County Sheriff's Office?
>
> A.   Yes, sir.   It did.
>
> Q.   And is it complete for that portion of the interview from the beginning to the end?   Is it a complete recording of that?

A.      Yes, sir, it's a complete recording of the redacted copy, the
        30 minutes that the disk that you guys made.[26]

Q.      And from your independent recollection of the interview,
        was that complete?

A.      Absolutely.   Yes, sir.

Q.      And when these are recorded, how are they stored at the
        Sheriff's Office?

A.      When the videos are recorded, the video system goes to a
        server and that's – it's a hard drive on like a big server,
        hard drive system.   And then the detectives burn a copy
        of the disk from that for the case file.

Q.      And this is an accurate copy from that server of that
        portion of the statement?

A.      Yes, sir.   It is.

(Doc. 296-4 at 996–97.)

Petitioner (who was proceeding *pro se* at this point of the trial) cross-

examined the detective about the electronic recording equipment:

Q.      Would that be digitally recorded?

A.      Yes, sir, it's digitally recorded into the server.

Q.      And then how do you gain access to that server?

A.      There's a password we put into the computer, and I put in
        a disk, and I can burn a copy from that on to a disk.

Q.      Do you know what a charge coupled device is?

A.      No, sir, I don't.

Q.      Do you know what an analog digital converter is?

---

26 Portions of the video were redacted because Petitioner was also questioned
about the murder of Larrick Sikes during the same interview.   See discussion infra
Part III(I) (Ground Six)

> A.    No sir, I do not.
>
> Q.    Do you know of any safety devices that would be in an analog digital converter that would insure that's an accurate reliable recording that's taking place?
>
> A.    No, sir, I couldn't – couldn't make any comments about that thing.   You would have to speak with the tech Peak about the actual software system itself.

(Id. at 1000-01.)   Petitioner told the trial court that Detective Lathrop "knows nothing about any type of authentication to [e]nsure that what's being recorded was properly recorded."   (Id. at 1001.)   Petitioner argued that "when you're dealing with digitally recorded photographs, digitally recorded recordings, there's a lot of room for error.   There's a lot of room for distortions."   (Id. at 1002.)   Petitioner complained that the video was insufficiently authenticated:

> Casey.    The – other than his firsthand knowledge, Your Honor, that that would be an accurate recording of –
>
> Court.    That's pretty good.
>
> Casey.    Well, Your Honor, he hasn't been able to establish that that's – was recorded accurately by the computer.
>
> Court.    He just said so.
>
> Casey.    Well, I would actually like to see that recording, because the one that I seen at the suppression hearing he led me into –
>
> · · ·
>
> Court.    The recording comes in – electronic recordings, electronic audio recordings come in very similar to that of a photograph.   If the person has personal knowledge of the recording and can testify that it is a true and accurate copy of the recording of the interview that he participated in or viewed, it comes into evidence as being authenticated through the witness.
>
> Casey.    Well, there's a problem –

> Court.   So your objection to 201 is denied and it will be admitted
> into evidence.

(Id. at 1003–05.)

By rejecting Petitioner's state habeas petition on this claim, the Second DCA implicitly found that the trial court did not err when it overruled Petitioner's objection to the video's authenticity.   To the extent Petitioner now argues that the state courts erred under Florida law by concluding that the video recordings were properly authenticated, he is not entitled to federal habeas corpus relief.   State courts, not federal courts on habeas review, are the final arbiters of state law.   See Agan v. Vaughn, 119 F.3d 1538, 1549 (11th Cir. 1997) (explaining that "state courts are the final arbiters of state law, and federal habeas courts should not second-guess them on such matters"); Bradshaw v. Richey, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law   . . . binds a federal court sitting in habeas corpus.").

Moreover, in Florida, "authentication for the purpose of admission is a relatively low threshold that requires only a prima facie showing that the proffered evidence is authentic; the ultimate determination of the authenticity of the evidence is a question for the fact-finder."   Mullens v. State, 197 So. 3d 16, 25 (Fla. 2016). And Detective Lathrop provided that prima facie showing by testifying that he viewed the redacted videos and that they were authentic.   Absent actual evidence of tampering (not present here), appellate counsel had no basis on which to appeal the video's authenticity or admission.   See Richardson v. State, 228 So. 3d 131, 134 (Fla 4th DCA 2017) (holding that surveillance video was properly authenticated

where video included date and time stamp, there was no evidence video was tampered with, and video was kept in a locked office).   The state court did not unreasonably conclude that appellate counsel's performance was not deficient for failing to raise this claim on direct appeal.   Freeman v. Att'y Gen., 536 F.3d 1225, 1233 (11th Cir. 2008) ("A lawyer cannot be deficient for failing to raise a meritless claim . . . .").   Petitioner is not entitled to federal habeas relief on Ground Five.

## I.   Ground Six (OP)

Petitioner asserts that appellate counsel "refused to raise on appeal the denial of a motion to suppress a November 2, 2010 false confession."   (Doc. 1 at 11.)[27]   He explains that the November 2, 2010 interrogation was conducted by two separate investigators concerning two unrelated murder investigations—the murder of Larrick Sikes and the murder of Ryan Vanderson.   (Id.)[28]   During the interview, Petitioner states that he was charged with both murders, but filed a *pro*

---

[27]   Petitioner filed a motion to suppress the admissions he made during a November 2, 2011 interview with the police regarding two separate murders. (Doc. 296-2 at 249.)   However, the date appears to be a mistake because the motion, which was filed on March 6, 2011, was directed to statements he made during a November 2, 2010 police interview.   (Id. at 245–49.)

[28]   During the interrogation, Petitioner confessed to paying somebody $5000 to kill Larrick Sikes because Sikes had "insulted us a couple of times" and had threatened to report Petitioner to the police for other crimes.   (Doc. 296-2 at 94–96, 97.)   Petitioner is currently serving a 14-year sentence for manslaughter in the death of Sikes in case number 10-CF-19945, which is the subject of a different habeas proceeding in this Court.   (See MDFL Case No. 2:16-cv-821-JES-KCD ("Sikes Case").)   Petitioner was originally charged with the second-degree murder of Mr. Sikes, but entered a negotiated no-contest plea to the reduced charge of manslaughter by a habitual violent felony offender.   (Sikes Case at D.E. 104-2 at 19–20.)   Petitioner voluntarily dismissed the Sikes habeas petition on November 11, 2023, and that federal case is closed.   (Id. at D.E. 168.)

*se* motion to suppress only in the Sikes case.   (Id.)   The motion was denied in the Sikes case after a December 13, 2011 hearing, but "prior to trial in the instant case, the judge issued a written order that the hearing would also extend to the [Vanderson case]."   (Id.)[29]   Petitioner asserts that appellate counsel should have argued that the December 13, 2011 suppression hearing was unfair, that he had not contacted Detective Lathrop prior to the (November 2, 2010) interrogation, and that only Detective Brown (not Detective Lathrop) read his Miranda rights prior to questioning him.   (Id. at 11–12.)   He also argues that the detectives promised him that they would arrest Melissa Alvarez for the murders of Vanderson and Sikes, but did not do so.   (Id. at 12.)   Petitioner raised this claim as one of ineffective assistance of appellate counsel in ground nine of his state habeas petition (Doc. 296-3 at 799–800), and it was denied by the Second DCA without a written opinion. (Id. at 911.)

A brief summary of the evidence offered during the December 13, 2011 suppression hearing (Doc. 296-2 at 460–705) is helpful for understanding this claim: During Detective John Lathrop's investigation of the murder of Ryan Vanderson, the detective learned that Petitioner had met with Vanderson shortly before his

---

[29] The precise nature of Petitioner's argument in Ground Six is unclear.   To the extent he argues that the trial court erred because the suppression hearing was intended to apply only to the Larrick Sikes investigation, Petitioner is confused. The transcript of the December 13, 2011 suppression hearing makes clear that the hearing was held for and would apply to both murder cases.   (Doc. 296-2 at 460.) (CITE?)   Therefore, the Court reviews Ground Six only to the extent Petitioner alleges that appellate counsel should have appealed the denial of his motion to suppress.

death.   Detective Lathrop also learned that Petitioner had illegally used his deceased brother's identification card during a traffic stop, so he drew up a probable cause affidavit on an identity-theft charge.

Thereafter, on October 20, 2010, Detective Lathrop came into contact with Petitioner as he was leaving his place of business with his girlfriend Melissa Alvarez.   He arrested Petitioner on the identity-theft charge, and Melissa Alvarez voluntarily went to the sheriff's office for questioning.   Once at the sheriff's office, Detective Lathrop read Petitioner his <u>Miranda</u> warnings, and Petitioner stated that he wished to speak without an attorney.   Although questioned about the Vanderson murder during the October 20, 2010 interview, Petitioner denied involvement.   But during questioning, Petitioner provided information on the murder of Larrick Sikes.   The police had not previously connected the two murders.

In the meantime, Melissa Alvarez gave explicit details to the police identifying Petitioner as Vanderson's killer.   Detective Lathrop arrested Petitioner for the Vanderson murder, and he was taken to jail.   Thereafter, the police department received three letters from Petitioner (addressed to the police, the state attorney, and the judge) containing confessions to the Vanderson "and other" murders.   In the letter to the police, Petitioner said that he wanted to speak with detectives.   The police brought Petitioner to the station.   Detective Brown (the investigator in the Sikes murder) read Petitioner his <u>Miranda</u> rights.   Petitioner confirmed that he wrote the letters.   He confessed to paying somebody to kill

Larrick Sikes.   He also confessed to planning and carrying out the Vanderson

murder.   (Id. at 474–591.)

During the hearing, Petitioner (who proceeded *pro se* at the hearing) argued

that when Detective Brown read his rights on November 2, 2010, Petitioner told the

detective that he could afford an attorney and that his statement was a clear

request for counsel.   Specifically, Petitioner questioned Detective Brown as follows:

> Q.   On November 2nd.   And at any point in time did I ask for an attorney?
>
> A.   No.
>
> Q.   Page F-282 of sworn transcribed statement of Brian Casey you asked me if you cannot afford a lawyer, one will be appointed for you.   I made an ambiguous request for counsel in that time, correct?
>
> A.   No, sir.   That's not correct.
>
> Q.   I can afford a lawyer.   Did I say that?
>
> A.   I believe you did, yes.
>
> Q.   At that point in time did you stop and clarify my intentions as to whether I was invoking my right to counsel?
>
> A.   I believe so, yes.
>
> Q.   So you clarified that?
>
> A.   Yes.
>
> Q.   I'm just saying, if you can't – if you can't afford one, one will be appointed for you before any questioning.   That's not questioning me of whether I'm invoking the right to remain silent or right to an attorney.   You seemed to roll over that, correct?
>
> A.   I don't understand your question, sir.

Q.   I'll rephrase it.   While you read me my <u>Miranda</u> rights, I requested an attorney by stating that I can afford a lawyer. Did you stop and clarify?

A.   I believe that's what I just said, yes, sir.

Q,   How did I respond?

A.   You responded that you understood that an attorney would be appointed for you and you understood all your rights, and you said you wished to talk to me.

Q.   After that point in time did you ask me if I understood each of these rights?

A.   I asked if you understood each of those rights, yes.

Q.   What did I respond to you?

A.   That you did.

(Doc. 296-2 at 658–59.)[30]   After the lengthy hearing, the trial court, ruling from the

bench, denied Petitioner's motion to suppress the confessions as follows:

> The Court is aware that you first had contact with Detective Lathrop on or about October 20th, 2010, at which time you were read your <u>Miranda</u> rights off a card dealing with the use of false identification for a driver's license.   There was also some questioning to be done about Ryan Vanderson, your contact with him or a point that you had with him.   The warning was read. You even stated at that time you could afford a lawyer, but you didn't want one now.
>
> You had some conversations about Vanderson with Detective Lathrop. You had some contact with Mr. Brown,

---

[30]   The Court has reviewed the transcript of the interview.   (Doc. 296–2 at 93–208.)   When Petitioner interrupted Detective Brown's reading of <u>Miranda</u> to state that he could afford a lawyer, Detective Brown stopped and stated, "Just sayin', if you can't – if you can't afford one, one will be appointed for you before any questioning if you wish.   If you decide to answer questions now without a lawyer present, you can stop answering at any time until you talk to a lawyer."   (Id. at 93.) Petitioner told Detective Brown that he understood and affirmed that he wanted to speak to the police.   (Id.)

Detective Brown.   You didn't want an attorney.   You had the money.

You said you were at the scene with Sikes and aided in the removal.   You had brought up with Detective [Lathrop] the name of Mr. Sikes and that you had heard other people had murdered someone, meaning Sikes. You were arrested.   You were transported to the jail. You had the first appearance.   And on the Vanderson murder, you filled out one of those forms that the public defender had.

Shortly after that, you wrote three letters.   You wrote letters to the homicide detectives.   You wrote letters to the state attorney's office, and you wrote a letter to the judge, who I take it you saw at first appearance.   In the letter that you wrote to the detectives you said you wanted to talk to them about a murder of a Ryan Silverstein and another murder that you were responsible for.   And since you had already been talking about Sikes, I would see where Detective Brown would be interested. They brought you in for questioning.   We saw the video. We saw Detective Brown read you <u>Miranda</u> off a card. He asked you if you understood the rights and having those rights in mind did you wish to talk.

Your point of where you said that I can afford a lawyer was not an indication of rights.   It wasn't equivocal. It was basically a statement that I can afford one if I want one.   I saw the conversation and the statements that you had with Detective Lathrop and Detective Brown.   I see no point where you offered or asked for an attorney.   I saw no portion where you asked that the questioning cease.   I saw your active participation.   Your motion to suppress all the statements that I saw on the video and any of the statements associated with the 21st or 20th of October will be denied.

(<u>Id.</u> at 690–92 (minor alterations made for clarity).)

By denying this claim when Petitioner raised it in his state habeas petition (Doc. 296-3 at 911.), the Second DCA determined that appellate counsel was not ineffective for failing to appeal the state court's denial of Petitioner's motion to

suppress.   And the Court agrees that reasonable competent appellate counsel could have concluded that there were no grounds on which to challenge Judge Volz's order.   Petitioner received <u>Miranda</u> warnings before questioning began.   And nothing in Petitioner's November 2, 2010 interview shows, or even suggests, that he made an unequivocal request for counsel.   See <u>Davis v. United States, 512 U.S. 452, 458 (1994)</u> ("[I]f a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation.").   And even if Petitioner's statement that he could afford a lawyer is liberally construed as a question, Detective Brown fulfilled his obligation under Florida law when, after the comment, he stopped reading <u>Miranda</u> and explained that Petitioner was entitled to an attorney.   See <u>Almeida v. State, 737 So. 2d 520, 525 (Fla. 1999)</u> (recognizing that if, during custodial interrogation, "a suspect asks a clear question concerning his or her rights, the officer must stop the interview and make a good-faith effort to give a simple and straightforward answer").

Finally, any argument that the detectives were required to give separate <u>Miranda</u> warnings during the same interview because they were investigating separate crimes is unsupported in law and does not entitle Petitioner to habeas relief.   See <u>United States ex rel. Henne v. Fike, 563 F.2d 809, 814 (7th Cir. 1977)</u> (recognizing that a suspect who is advised that he is being investigated for one crime—and who is given <u>Miranda</u> warnings—need not be given the warnings a second time before being asked about a different crime); <u>Jarell v. Balkcom, 735 F.2d</u>

1242, 1254 (11th Cir. 1984) ("[T]he fact that Jarrell confessed to a state officer (Blannott) other than the one who administered the Miranda warnings (Bishop), does not render the warnings insufficient, especially since, before interrogating Jarrell, Blannott asked Bishop in Jarrell's presence whether petitioner had received his <u>Miranda</u> warnings."); United States v. Hopkins, 433 F.2d 1041, 1045 (5th Cir. 1970) (finding that questions from a state detective about a state crime— asked almost immediately after the suspect's interrogation by a federal agent about a federal crime—were "so intertwined with the interrogation" from a federal agent (who had read <u>Miranda</u> to the suspect) that the defendant "must have been aware of his constitutional rights with regard to [the state detective's] query and, by this answer, [the defendant] knowingly waived those rights").   The Second DCA's rejection of Ground Six was neither contrary to clearly established federal law nor based upon an unreasonable determination of the facts, and the claim is denied.

## J.   Ground Seven (OP), Ground Seventeen (OP)

In Ground Seven, Petitioner argues that appellate counsel was ineffective for failing to appeal the denial of his March 27, 2012 motion to dismiss for speedy trial violations.   (Doc. 1 at 13.)   In Ground Seventeen, Petitioner alleges that the trial court erred by failing to rule on a motion to discharge the case.   (Id. at 25.)

Petitioner raised a similar ineffective assistance of appellate counsel claim in ground seven of his state habeas petition.   (Doc. 296-3 at 796.)   In response to Petitioner's state habeas petition, the state noted that "Petitioner repeatedly welcomed and rejected a speedy trial approximately 18 times."   (Id. at 833.)   The state explained:

In reviewing the history of Petitioner's motions and notices related to speedy trial, the docket reflects that the last filings on this point were:

> 1)   a Notice of Expiration of Speedy Trial filed on 4/6/12; and
>
> 2)   a Motion for Continuance filed 4/17/12.

Appellant filed his last Demand for Speedy Trial on November 23, 2011 and withdrew it three weeks later on December 13, 2011.   Appellant twice filed a Notice of Expiration of Speedy Trial.   Appellant followed the first, filed on December 29, 2011, with three motions for continuance filed in January and February of 2012.   Appellant filed a second Notice of Expiration of Speedy Trial on April 6, 2012.   A pro-se continuance motion then followed on April 17, 2012.

"Rule 3.191(a) is not self-executing but must be triggered by the defendant's filing a notice of expiration of the speedy trial period."   Palmer v. State, 76 So. 3d 1016 (Fla. 2d DCA 2011).   When a defendant files a notice of continuance before the speedy trial period runs, speedy trial is waived.   At that point, speedy trial can only be obtained by filing a demand for speedy trial.   State v. Gibson, 783 So. 2d at 1158-1159.   Notice of expiration of speedy trial will not suffice.   Id.   Thus, the April 6, 2012 Notice did not trigger speedy trial.

Even if the April 6, 2012, Notice had triggered the speedy trial period, Petitioner followed that pleading ten days later with another Motion for Continuance.   This record makes clear that appellate counsel had no basis to raise a speedy trial claim on appeal.

(Doc. 296-3 at 833–34 (citations to the record omitted).)   The Second DCA denied this claim without a written opinion.   (Id. at 911.)

To the extent Petitioner contends that appellate counsel should have argued on direct appeal that the trial court violated Florida's speedy trial rules when it denied (or failed to rule on) any of his motions to discharge, the Second DCA (by denying this claim) implicitly determined that no such violation of the state rules

occurred.   And a habeas court will not challenge a state court's application of state laws.   See Agan, 119 F.3d at 1549.

And even if Petitioner now argues that appellate counsel should have raised a Sixth Amendment speedy trial claim, he has not demonstrated that a constitutional speedy trial violation actually occurred.[31]   Most notably, Petitioner's frequent motions for continuances and apparent unreadiness to proceed to trial at any of the times he asserted his right weighs heavily against a speedy trial violation.   See Barker, 407 U.S. at 536 ("[B]arring extraordinary circumstances, we would be reluctant indeed to rule that a defendant was denied this constitutional right on a record that strongly indicates, as does this one, that the defendant did not want a speedy trial.")   And given that Petitioner was the primary cause of the 19-month delay between his arrest and trial in this case, reasonable competent appellate counsel could have concluded that Petitioner could not show prejudice from the delay.   See United States v. Ingram, 446 F.3d 1332, 1337 (11th Cir. 2006)

---

[31] Petitioner cited in his state habeas petition (without explanation) the Supreme Court case of Barker v. Wingo, 407 U.S. 514 (1972).   (Doc. 296-3 at 796.) And in his section 2254 petition, Petitioner states that his Sixth Amendment rights to a speedy trial were violated.   (Doc. 1 at 13.)   The Barker Court held that a determination of whether the Sixth Amendment's right to a speedy trial was violated must be made on a case-by-case basis.   407 U.S. at 522.   The Court identified four factors to consider: (1) the length of the delay; (2) the reason for the delay; (3) the time and manner in which the defendant has asserted his right; and (4) the prejudice caused by the delay.   Id. at 530–32.   That the state did not explicitly address Barker in its response to the habeas petition does not lessen this Court's deference to the appellate court's rejection of Ground Seven.   Petitioner is still required to show that "there was no reasonable basis for the state court to deny relief."   Harrington, 562 U.S. at 98.

("[A] defendant who intentionally evades the Government's efforts to bring him to trial is culpable in causing the delay."); United States v. Tranakos, 911 F.2d 1422, 1429 (10th Cir. 1990) (explaining that the third Barker factor weighs against a defendant who "moves for dismissal on speedy trial grounds" but whose "other conduct indicates a contrary desire"); Sneed v. Fla. Dep't of Corr., 496 F. App'x 20, 24 (11th Cir. 2012) ("[I]f the state pursued prosecution with reasonable diligence, then the defendant must show actual prejudice to prevail on a Sixth Amendment speedy trial claim.").

Whether construed as a state-law speedy trial claim or as a Sixth Amendment claim under Barker, Petitioner has not met his burden of showing that the state courts unreasonably denied Ground Seven on either Strickland prong, and he is not entitled to habeas relief on Ground Seven.   Petitioner admits that he did not raise Ground Seventeen as a claim of trial court error on direct appeal.   (Doc. 1 at 25.)   Accordingly, Ground Seventeen is subject to dismissal as unexhausted. Even so, because the Court finds that a motion to dismiss or discharge on speedy trial grounds would have been meritless, see discussion infra, Part III(J), Ground Seventeen is also denied on the merits.   28 U.S.C. § 2254(b)(2).

## K.   Ground Eight (OP)

Petitioner alleges that he filed a pretrial writ of habeas corpus in the state appellate court "alleging illegal police conduct and evidence tampering."   (Doc. 1 at 15.)   He alleges that the petition was denied by the Second DCA without a hearing and thereafter dismissed by the Florida Supreme Court.   (Id.)   He now alleges that

64

appellate counsel was ineffective for failing to raise the claim a second time on direct appeal.   (Id.)[32]

Petitioner has not met his burden of showing <u>Strickland</u> prejudice.   Most notably, he admits that the Second DCA—the same court that would have reviewed the claim on direct appeal—already reviewed, <u>and rejected</u>, the claim, confirming that the writs did not provide a basis for reversible error.   In addition, Petitioner has not provided actual evidence of police misconduct and evidence tampering, and his claims of misconduct are speculative.   <u>See</u> discussion <u>supra</u>, Part III (A), (B), (D) (discussing speculative assertions).   Appellate counsel was not ineffective for failing to raise a duplicate, futile, and unsupported claim.   Ground Eight is denied.

### L.      Ground Ten (OP)

Petitioner raises two claims in Ground Ten.   First, he asserts that appellate counsel was ineffective for failing to argue "bad faith selective prosecution" because evidence was offered at trial that Melissa Alvarez helped him set the fire in Vanderson's home but was never prosecuted.   (Doc. 1 at 18.)   Petitioner raised a similar claim in ground four of his state habeas petition (Doc. 296-3 at 793), and it was denied by the Second DCA without a written opinion.   (Id. at 911.)

To establish a selective prosecution claim, "a defendant must show that the prosecutorial policy had a discriminatory effect and that it was motivated by a discriminatory intent."   <u>Richardson v. State</u>, 831 So. 2d 799, 801 (Fla. 2d DCA

---

[32] It is not clear that Petitioner exhausted this ineffective assistance of appellate counsel claim in state court.   Nevertheless, the claim is denied on the merits.   <u>See</u> 28 U.S.C. § 2254(b)(2).

2002) (citing United States v. Armstrong, 517 U.S. 456, 465 (1996)).   To show

discriminatory intent, Petitioner must show that he was singled out for prosecution

based upon such impermissible considerations as race, religion, or the desire to

prevent his exercise of a constitutional right.   State v. Parrish, 567 So.2d 461, 465

(Fla. 1st DCA 1990).   Petitioner has not shown (and a review of the record does not

suggest) that he was singled out for prosecution based upon his race, religion, or a

desire to permit his exercise of a constitutional right.   Reasonable competent

appellate counsel could have concluded that raising such a claim would have been

meritless, and the Second DCA's rejection of this claim was neither contrary to

Strickland nor based upon an unreasonable determination of the facts.   Petitioner

is not entitled to federal habeas relief on the first part of Ground Ten.

Next, Petitioner argues that an investigative report "was photocopied directly

into the Defendant's presentence investigation and that the report was not the real

record of events."   (Doc. 1 at 18.)   It is not clear that Petitioner raised this second

part of Ground Ten in state court, and it appears to be unexhausted.   Moreover,

Petitioner's claim that the report of the presentence investigation was altered so as

to distort the real record of events suffers from the same defect as his other claims

alleging that the state has tampered with or altered the record.   Petitioner does not

produce (and did not produce in state court) the unaltered version of the documents,

and speculation without proof cannot support a federal habeas claim.   See

discussion supra Part III (A), (B), (D); Tejada, 941 F.2d at 1559.   Therefore, even

unexhausted, the second portion of Ground Ten is also denied on the merits.   28 U.S.C. § 2254(b)(2).

### M.   Ground Eleven (OP)

Petitioner asserts that he was denied effective assistance of appellate counsel because appellate counsel did not argue that the trial court would not "sign and seal pro se handwritten subpoenas."   (Doc. 1 at 18–19.) Petitioner raised a similar claim in ground ten of his state habeas petition.   (Doc. 296-3 at 800–01.)   In that claim, Petitioner alleged that he would have called witnesses to "impeach detectives and prove government misconduct" of "evidence tampering" and that "detectives committed crimes."   (Id.)   The Second DCA denied the claim without a written opinion.   (Id. at 911.)

The issue of Petitioner's defense witnesses was raised in the trial court, and the record refutes any claim that Petitioner was denied the right to call witnesses. While still acting as standby counsel, Mr. Ermacora addressed the trial court regarding the witnesses that Petitioner wanted to call.   He explained:

> Judge, and just let me say that, as you've heard several times, I issued over 100 subpoenas at Mr. Casey's request in this matter to witnesses that he asked, And Your Honor – although he was representing yourself [sic], Your Honor asked me to assist him with respect to that and I did issue all of those subpoenas.
>
> It was quite clear to me what Mr. Casey did was go through all the discovery and virtually every name that he found in discovery he asked for a subpoena to go out to.   And as I indicated, I sent out those subpoenas, I actually did it personally so I had a chance to consider every one of the witnesses that he asked me to subpoena, and as to whether or not in my professional opinion they would in any way assist the defense or further this trial.

> Not one of those witnesses, from what I knew about them, and without exception, every one of them that I spoke to – and I won't say that I spoke to all 110.   Some of them couldn't be located, a couple of them I could not even find if they existed based on the information that I had.   But, without exception, everybody that I spoke to would – either knew nothing about the case, what they knew was miniscule, irrelevant, and/or not only would they not help the defense, but no doubt would be harmful to the defense.
>
> So, it's not because of lack of consideration or lack of trying that I'm going to indicate to you Your Honor that I don't have any other witnesses that I intend to call on behalf of the defense.

(Doc. 296-4 at 1746–47.)

Accordingly, there is no evidence that Petitioner was, as he now alleges, prohibited from calling witnesses, and appellate counsel had no grounds on which to raise this claim on direct appeal.   Moreover, to show prejudice resulting from a missing witness, "the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense."   Bray v. Quarterman, 265 F. App'x 296, 298 (5th Cir. 2008); see United States v. Ashimi, 932 F.2d 643, 650 (7th Cir. 1991) ("[E]vidence about the testimony of a putative witness must generally be presented in the form of actual testimony by the witness or an affidavit.   A defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim.") (footnotes omitted); United States v. Porter, 924 F.2d 395, 397 (1st Cir. 1991) (holding that failure to interview witnesses could not constitute ineffective assistance without a showing that the investigation would have helped the defendant).   Here, Petitioner does not even

name the witnesses who would have offered helpful testimony, much less detail their specific testimony in affidavits.   In other words, he has not identified the specific claim or arguments that appellate counsel should have raised on appeal. Because he does meet his burden of proving that the Second DCA unreasonably applied <u>Strickland</u> or unreasonably determined the facts in denying this claim, he is not entitled to federal habeas relief on Ground Eleven.

### N.   Ground Twelve (OP)

Petitioner asserts that he was denied effective assistance of counsel at sentencing.   (Doc. 1 at 20.)   He asserts that the State "sought habitualization at sentencing with unauthenticated BOP records that did not have a print card and the Department of Justice letter attached claimed all prior records were destroyed. The Defendant's signatures did not match, and counsel failed to object."   (Id.) Petitioner raised this claim as ground six of his Rule 3.850 Motion where he alleged that the State's fingerprint examiner was unqualified to compare latent prints and that he was never served with the State's notice of intent to seek sentence enhancement.   (Doc. 296-3 at 944–45.)   The postconviction court denied the claim as follows:

> The record refutes Defendant's allegations.   A habitual felony offender [notice] was filed on May 18, 2012 and served on the Defendant and his attorney; therefore, proper notice was given. Likewise, a notice of intent to rely upon certification of business records was also filed on May 18, 2012.
>
> To the extent Defendant believes that the State's fingerprint analyst was not qualified, the record refutes this contention, because at the sentencing hearing, Ms. Conrad testified that she is employed as a latent print examiner, that she has take[n] numerous classes, and she also testified as to her methodology.

> Likewise, all records, including those with his signature were
> authenticated and admissible via the business record exception.
> Accordingly, counsel cannot be deemed ineffective for failing to
> raise meritless claims and objections; therefore, Ground Six is
> without merit.

(Doc. 296-3 at 1097 (citations to the record omitted).)   The postconviction court

attached the State's Habitual Felony Offender Notice and Notice of Intent to Rely

upon Certification of Business Record to its order.   (Id. at 1541–42.)   The Second

DCA affirmed the holding on appeal.   (Doc. 186-3 at 135.)

The postconviction court's conclusion that the state served Petitioner and

trial counsel with notice that it intended to seek an enhanced sentence is a finding

of fact, entitled to deference on federal habeas review.   See 28 U.S.C. § 2254(e)(1)

("[A] determination of a factual issues made by a State court shall be presumed to

be correct.")   Petitioner has not rebutted the presumption of correctness afforded a

state court's factual findings, and the Court finds that he received the notice due.

As to Petitioner's assertion that the state's latent print examiner was

unqualified, she testified that she had taken "numerous classes and training in the

latent field, such as ridgeology, classification, palm print classification, and other

classes of that nature" and had practiced print examinations for six years.   (Doc.

296-3 at 589.)   She testified that the prints taken by the state were "identical" to

those offered by the United States Government from Petitioner's prior incarceration

in federal prison.   (Id. at 590–91.)   Mr. Ermacora had no grounds on which to

object to the State's notice or to the print examiner's qualifications, and he was not

ineffective for failing to do so.

The claim also fails to satisfy <u>Strickland</u>'s prejudice prong.   Petitioner

presents no evidence (and does not even allege) that he was wrongly identified as

the person who committed the prior crimes or that his extensive criminal history

was insufficient to qualify him for enhanced sentencing.   <u>See</u> <u>Newkirk v. State</u>, 947

<u>So.2d 548, 549 (Fla. 4th DCA 2006)</u> (finding that a Rule 3.850 movant failed to show

prejudice from trial counsel's failure to object to evidence of prior convictions where

the movant did not allege that the convictions used to enhance his sentence were

not his or that he did not qualify for an enhanced sentence).   Petitioner has not met

his burden of showing that the state court's rejection of Ground Twelve entitles him

to federal habeas relief.   Ground Twelve is denied.

### O.   Ground Thirteen (OP)

Petitioner asserts that trial counsel was ineffective for failing to file a timely

motion for a new trial.   (Doc. 1 at 21.)   Specifically, he argues:

> Counsel argued orally a new trial motion outside the 10 day
> limit for post-trial motions.   He did not file a motion for new
> trial with the clerk.   He did not raise grounds that witnesses for
> the defense were not present for trial or motions to disqualify
> the trial judge prior to and during trial, [rendering] the trial
> unfair in violation of the Sixth Amendment.

(Id.)   Petitioner raised a similar claim in ground twelve of his Rule 3.850 Motion

where he asserted that trial counsel failed to file a motion for new trial within ten

days of the verdict.   (Doc. 296-3 at 953.)   The postconviction court denied the claim

on both <u>Strickland</u> prongs as follows:

> A motion for new trial filed pursuant to rule 3.600 requires a
> trial court to review the weight of the evidence, not the
> sufficiency of the evidence, and "when hearing a motion for new
> trial predicated on the verdict's being contrary to the weight of

the evidence the trial court must base its decision solely on the record and the evidence upon which the jury reached its verdict." State v. Riggins, 314 So. 2d 238, 240 (Fla. 4th DCA 1975).

Clearly in the case at bar the weight of the evidence supports the jury's determination.   Defendant made three separate confessions, which were corroborated by later police investigation based on these confessions.   Accordingly, there is no reasonable probability that the outcome of the proceedings would have been different had counsel filed a motion for new trial.   Moreover, the record reflects that trial counsel determined, in his professional opinion, that Defendant's post-trial motions were meritless.   Strategic or tactical decisions of counsel do not constitute ineffective assistance of counsel. Here, the transcript expressly demonstrates counsel's reasoning, unequivocally shows that counsel's decision was conscious and strategic, and conclusively refutes Defendant's claim that counsel was ineffective within the meaning of Strickland. Jackson v. State, 975 So. 2d 485 (Fla. 2d DCA 2007).   For the above stated reasons Ground Twelve is without merit.

(Doc. 296-3 at 1100–01 (citations to the record omitted and minor alterations made for clarity).)   The Second DCA affirmed without a written opinion.   (Doc. 186-3 at 135.)

A review of the record supports the state courts' rejection of this claim.   At Petitioner's May 30, 2012 sentencing hearing, Mr. Ermacora proactively brought up this issue, noting that Petitioner had asked him to file a motion for a new trial only that morning, which was past the deadline to do so.   (Doc. 296-3 at 580–81.)   Mr. Ermacora stated that, nevertheless, he had already considered filing a motion for a new trial, but in "[his] professional opinion, there were no grounds to bring it and it certainly didn't have any reasonable chance of success."   (Id. at 581.)   The Court then discussed with the state whether any of Petitioner's timely-filed *pro se* motions could be construed as a motion for a new trial (given that Petitioner had filed

numerous *pro se* motions during the ten days after his trial), but the Court ruled that "[a]ny motion for arrest of judgment or for any new trial will be denied."   (Id. at 584.)

Petitioner can show no ineffective assistance from Mr. Ermacora's failure to timely file a motion for a new trial.   Mr. Ermacora told the state court that, in his professional opinion, there were no grounds on which to file a motion for new trial. Therefore, even had Petitioner timely requested such motion, Mr. Ermacora would not have filed it.   And, whether parsed in terms of performance or prejudice, strategic decisions are virtually unassailable on habeas review.   See Strickland, 466 U.S. at 690–91.   In addition, as noted by the postconviction court   (Doc. 296-3 at 1100–01), Petitioner confessed to the police during a recorded interrogation, to his friend and former business partner Ann Marie Shields during recorded telephone conversations, and in letters to the police, the judge, and the state attorney.   (See Doc. 293-3 at 860–66, 1017, 1056, 1726–27; see also discussion supra Part III (summarizing the trial evidence).)   The confessions were later corroborated by the police investigation.   See discussion supra Part III (discussion). Given the confessions and corroborating evidence, reasonable competent counsel could have concluded (as did Mr. Ermacora) that challenging the weight of the evidence would have been futile.   Finally, while Petitioner faults trial counsel for not filing the motion, he has still not set forth facts or grounds that would justify a new trial.   The Court once again notes that Petitioner has the burden of proof on federal habeas review.   Wong, 558 U.S. at 27.   The state courts' rejection of this

claim was neither contrary to <u>Strickland</u> nor based upon an unreasonable

determination of the facts.   Petitioner is not entitled to federal habeas relief on

Ground Thirteen.

### P.      Ground Fifteen (OP)

Petitioner alleges that "[t]he State admitted the case agent criminal

investigation was fabricated" and that the State did not rebut his defense that the

murder was an accident.   (Doc. 1 at 24.)   He therefore alleges that Mr. Ermacora

was ineffective for failing to "file a motion for arrest of judgment" on the charge of

second-degree murder.   (Id.)   Petitioner raised a similar claim in ground five of his

Rule 3.850 Motion, and the postconviction court determined that trial counsel had

no grounds to file such a motion under Florida law:

> Defendant argues that his counsel was ineffective for failing to
> file a detailed motion for arrest of judgment based upon the
> argument "that the State was required to convict the Defendant
> on more evidence than an uncorroborated involuntary false
> confession, especially when no evidence was introduced at trial
> inconsistent with the Defendant's defense."   Defendant
> contends that if one merely overlooks his allegedly involuntary
> confession to police, the State had no direct evidence to overcome
> his trial testimony that the shooting was an accident.
> Accordingly, he believes his counsel should have moved for an
> arrest of judgment based on insufficient evidence.
>
> Despite what the Defendant may wish, his taped police
> confession was introduced as evidence at the trial, and would
> therefore make any motion for arrest of judgment meritless, and
> counsel cannot be deemed ineffective for failing to file a
> meritless motion.   Kormondy v. State, 983 So. 2d 418 (Fla.
> 2007).   In any event, even assuming, arguendo, that
> Defendant's confession was involuntary and was excluded as
> evidence, Defendant made a second confession to Ms. Shields, as
> noted above in the Court's analysis of Ground Three.   Likewise,
> Defendant also sent letters to detectives confessing.
> Accordingly, there still would have been sufficient evidence for a

conviction, and Defendant cannot establish prejudice.   See Barwick v. State, 88 So. 3d 85 (Fla. 2011) (holding that when a defendant confesses to the crime, and the confession is admitted into evidence, a claim that counsel was ineffective in failing to effectively cross examine a witness will be denied because defendant cannot establish prejudice).   See also Betts v. State, 792 So. 2d 589 (Fla. 1st DCA 2001) (affirming the summary denial of a claim of ineffective assistance of counsel for failure to call witness for failure to demonstrate prejudice when the victim gave valid out-of-court and in-court identifications of the defendant as the perpetrator, and the defendant gave a valid written confession of having shot and robbed the victim).

None of the grounds for the granting of a motion for arrest of judgment are applicable to Defendant's case either.   See Fla. R. Crim. P. 3.610.   Notably, on May 30, 2012, defense counsel noted this very same insufficiency in Defendant's arguments for arrest of judgment when he determined, in his professional opinion, that Defendant's motion for arrest of judgment had no merit and did not warrant adoption by him.   Strategic or tactical decisions of counsel do not constitute ineffective assistance of counsel.   Gonzales v. State, 691 So. 2d 602 (Fla. 4th DCA 1997).   While generally an evidentiary hearing is needed to determine whether a counsel's decisions were the product of strategy, "an evidentiary hearing is not required when it is obvious from the record that counsel's decision was strategic."   Jackson v. State, 975 So. 2d 485 (Fla. 2d DCA 2007). Here, the transcript expressly demonstrates counsel's reasoning, unequivocally shows that counsel's decision was conscious and strategic, and conclusively refutes Defendant's claim that counsel was ineffective within the meaning of Strickland. Accordingly, for the above stated reasons, Ground Five is without merit.

(Doc. 296-3 at 1095–96 (internal citation to the record omitted).)   The Second DCA affirmed without a written opinion.   (Doc. 186-3 at 135.)

Once again, Petitioner has provided no grounds for habeas relief.   As to Petitioner's argument that Mr. Ermacora should have moved for an arrest of judgment under Rule 3.610 of the Florida Rules of Criminal Procedure, he does not identify the portion of the rule that would apply to his situation.   Rule 3.610

provides that the court may grant a motion for arrest of judgment only if:

> (a) the indictment or information on which the defendant was tried is so defective that it will not support a judgment of conviction;
>
> (b) the court is without jurisdiction of the cause;
>
> (c) the verdict is so uncertain that it does not appear therefrom that the jurors intended to convict the defendant of an offense for which the defendant could be convicted under the indictment or information; or
>
> (d) the defendant was convicted of an offense for which the defendant could not be convicted under the indictment or information.

Fla. R. Crim. P. 3.610.   To the extent Petitioner challenges the propriety of the charging document or the charges against him under sections (a), (c), or (d) of Rule 3.610, he "is required to show not that the [information] is technically defective but that it is so fundamentally defective that it cannot support a judgment of conviction." Ford v. State, 802 So. 2d 1121, 1130 (Fla. 2001).   Petitioner made no such showing or allegation in state court, and he does not do so here.   Likewise, Petitioner does not challenge the jurisdiction of the court that convicted him.   In other words, Petitioner has not explained or proven entitlement to arrest of judgment under any portion of Rule 3.610.

And to the extent Petitioner now claims that Mr. Ermacora did not challenge the sufficiency of the evidence, he is wrong.   At the close of the State's case, Mr. Ermacora moved for a judgment of acquittal on the ground that "[t]he evidence with respect to the statements made by the defendant and all the circumstances are unreliable evidence and shouldn't be presented to the jury."   (Doc. 296-4 at 1744.)

He also argued that the state had not proved that Petitioner "acted with a depraved mind" or that he was involved in the arson.   (Id.)   The trial court denied the motion for judgment of acquittal.   (Id. at 1745.)

Petitioner has not shown that Mr. Ermacora's performance was constitutionally ineffective.   Accordingly, the state courts' rejection of this claim was neither contrary to Strickland nor based upon an unreasonable determination of the facts.   Petitioner is not entitled to federal habeas relief on Ground Fifteen.

### Q.     Ground Sixteen (OP)

Petitioner asserts that trial counsel was ineffective for failing to suppress the content of telephone conversations he had with his friend and former business partner Ann Marie Shields that occurred while he was in jail.   (Doc. 1 at 24.)   He asserts that he (Petitioner) fabricated the content of the calls so that he would receive the death penalty and that "Ann Marie Shields elicited the incriminating statements for the detectives in the case with an interest in convicting the defendant."   (Id.)   He further alleges that the calls were not properly disclosed to the defense and were not properly admitted as business records.   (Id. at 25.)

Petitioner raised similar arguments in ground three of his Rule 3.850 Motion. (Doc. 296-3 at 936–39.)   The postconviction court denied the claim, noting that the record clearly refuted any contention that the evidence of the phone calls was not properly disclosed.   (Id. at 1093–94.)   The postconviction court also concluded that any argument that the phone calls were illegally seized and lacked a proper foundation was also refuted by the record and without merit.   (Id. at 1094.)   The court explained:

There is no reasonable expectation of privacy in a telephone communication from jail during which warnings were issued; therefore, the recording of these conversations was not illegal. Jackson v. State, 18 So. 3d 1016, 1030 (Fla. 2009). The record reflects that Detective John Lathrop testified at trial as to the authenticity of the phone recordings, as well as noting that each phone call began with a recording advising the person that the call is being recorded.

Likewise, Ms. Shields testified at trial about receiving the phone calls from the Defendant from jail, and acknowledging that she had been warned they were being recorded. Notably, these phone recordings were played for the jury, and in them Defendant confesses to the crimes he was charged with and discusses his attempts to cover up the crimes. Accordingly, any attempt by counsel to suppress this evidence based on Defendant's arguments would have been meritless. Counsel "cannot be deemed ineffective for failing to raise meritless claims or claims that had no reasonable probability of affecting the outcome of the proceeding." Teffeteller v. Dugger, 734 So. 2d 1009 (Fla. 1999). Ground Three is therefore, without merit.

(Id. (citations to the record omitted).)   The Second DCA affirmed the ruling on

appeal.   (Doc. 186-3 at 135.)

Once again, Petitioner does not explain his entitlement to federal habeas

relief.   While the issue is raised as one of ineffective assistance of counsel, the

underlying issue of whether a discovery violation occurred is a question of state law.

And the state court's denial of this claim is dispositive of the underlying state law

issue and ultimately binds this Court.   See Estelle v. McGuire, 502 U.S. 62, 67

(1991) ("[I]t is not the province of a federal habeas court to reexamine state-court

determinations on state-law questions. In conducting habeas review, a federal court

is limited to deciding whether a conviction violated the Constitution, laws, or

treaties of the United States."); Cisneros v. McNeil, No. 8:05cv762–T–27TGW, 2008

WL 1836368, at *5 (M.D. Fla. Apr. 23, 2008) ("Whether the trial court failed to

conduct a <u>Richardson</u> hearing is a matter of state law and is not cognizable on federal habeas corpus review.").   Because the state postconviction court concluded that no discovery violation occurred and that the defense was properly notified of its intent to enter the calls into evidence, trial counsel could not have been ineffective for failing to argue otherwise.   See <u>Strickland</u>, 466 U.S. at 687, 694.

Likewise, "[a]s a general rule, a federal court in a habeas corpus case will not review the trial court's actions concerning the admissibility of evidence" because the state court has wide discretion in determining whether to admit evidence at trial. <u>Alderman v. Zant</u>, 22 F.3d 1541, 1555 (11th Cir. 1994); <u>see also</u> <u>Baxter v. Thomas</u>, 45 F.3d 1501, 1509 (11th Cir. 1985) (federal habeas corpus is not the proper vehicle to correct evidentiary rulings).   Nonetheless, reasonable jurists would not debate the trial court's admission of this evidence.   As explained by the postconviction court, Petitioner had no reasonable expectation of privacy in the telephone calls made from jail.   See <u>Jackson v. State</u>, 18 So. 3d 1016, 1030 (Fla. 2009) ("[T]here is no reasonable expectation of privacy in . . . a telephone communication from jail during which warnings are issued[.]").   Petitioner was warned before every call with Ms. Shields that the calls were recorded.   (<u>See</u> Doc. 296-2 at 454, 465, 497, 510, 526, 540, 554.)   Therefore, under <u>Jackson</u>, he had no expectation of privacy, and the calls were admissible.   Because Petitioner cannot show that the trial court erred in admitting the calls, Mr. Ermacora could not have been deficient for failing to challenge their admission.   See <u>Strickland</u>, 466 U.S. at 687, 694.   The state courts did not unreasonably conclude that Petitioner is not entitled to relief on this

claim, and Ground Sixteen is denied.

### R.   Ground Eighteen (OP)

Petitioner claims that his custody violates the Eighth Amendment's cruel and unusual punishment clause.   (Doc. 1 at 26.)   He asserts that since his incarceration, "DOC Officers have used psychological abuse, physical abuse, starvation, threats, inmate assaults, and long term isolation to sensor [sic] post-conviction appeals."   (Id.)   These claims do not belong in a section 2254 habeas petition.   When, as here, "an inmate challenges the circumstances of his confinement but not the validity of his conviction and/or sentence, then the claim is properly raised in a civil rights action under [42 U.S.C.] § 1983."   Hutcherson v. Riley, 468 F.3d 750, 754 (11th Cir. 2006) (internal quotations omitted); see also Vaz v. Skinner, 634 F. App'x 778, 780 (11th Cir. 2015) ("[C]laims challenging the conditions of confinement fall outside of habeas corpus law.").   Accordingly, the claims raised in Ground Eighteen are dismissed without prejudice.

### S.   Ground Nine (TAP)

In Ground Nine of Petitioner's counseled petition, Habeas Counsel argues that "[t]he cumulative impact of Constitutional violations alleged in this Petition establishes a violation of [Petitioner's] rights under the Fifth, Sixth, and Fourteenth Amendments of the U.S. Constitution."   (Doc. 172 at 19.)   Petitioner did not raise this claim in state court, and as a result, it is subject to dismissal as unexhausted and untimely.   Moreover, to the extent Habeas Counsel raises this as an ineffective assistance claim, Petitioner has not established prejudice as to any individual claim or the collective effect of any deficient performance on the trial.   See Morris v.

Sec'y, Dep't of Corr., 677 F.3d 1117, 1132 (11th Cir. 2012) (rejecting claim of cumulative error since "none of [Petitioner's] individual claims of error or prejudice have any merit, and therefore we have nothing to accumulate").   And finally, absent Supreme Court precedent applying the cumulative error doctrine to federal habeas corpus claims, Petitioner cannot show entitlement to relief on a cumulative error claim under 28 U.S.C. § 2254(d)(1).   See Forrest v. Fla. Dep't of Corr., 342 F. App'x 560, 565 (11th Cir. 2009).   Therefore, in addition to being dismissed as unexhausted and untimely, Ground Nine is denied on the merits.

## IV.   Conclusion

Based on the foregoing, and as specified above, Petitioner is not entitled to relief on any habeas claim presented here.

Accordingly, it is ordered that:

1.   The Clerk is **DIRECTED** to dismiss the Attorney General as a respondent in this action and to terminate this party from the file.

2.   Petitioner's motion for leave to file a *pro se* reply (Doc. 304) is **GRANTED** to the extent the Court has considered the reply filed by Petitioner on April 19, 2023 (Doc. 305) when reviewing the petitions.

3.   Each claim in Petitioner's 28 U.S.C. § 2254 petition (Doc. 1) and third amended 28 U.S.C. § 2254 petition (Doc. 172) is denied on the merits, dismissed as untimely, or dismissed as unexhausted as specified above. Therefore, Petitioner is not entitled to federal habeas corpus relief, and the petitions (Doc. 1, Doc. 172) are **DENIED**.

4.     The Clerk is further **DIRECTED** to enter judgment in favor of

Respondent and against Petitioner, deny any pending motions as moot,

terminate any deadlines, and close this case.

## Certificate of Appealability[33]

A prisoner seeking a writ of habeas corpus has no absolute entitlement to

appeal a district court's denial of his petition.   28 U.S.C. § 2253(c)(1).   Rather, a

district court or circuit justice or judge must first issue a certificate of appealability

(COA).   "A [COA] may issue . . . only if the applicant has made a substantial

showing of the denial of a constitutional right."   28 U.S.C. § 2253(c)(2).   To make

this substantial showing, a petitioner "must demonstrate that reasonable jurists

would find the district court's assessment of the constitutional claims debatable or

wrong," Slack v. McDaniel, 529 U.S. 473, 484 (2000), or that "the issues presented

are adequate to deserve encouragement to proceed further."   Miller-El v. Cockrell,

537 U.S. 322, 336 (2003).   When, as here, the district court has rejected a claim on

procedural grounds, the petitioner must show that "jurists of reason would find it

debatable whether the petition states a valid claim of the denial of a constitutional

right and that jurists of reason would find it debatable whether the district court

was correct in its procedural ruling."   Slack, 529 U.S. at 484.

---

[33] Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases in the
United States District Courts, the "district court must issue or deny a certificate of
appealability when it enters a final order adverse to the applicant."

Upon consideration of the record, the Court declines to issue a COA.

Because Petitioner is not entitled to a COA, he is not entitled to appeal in forma

pauperis.

**DONE AND ORDERED** in Fort Myers, Florida on April 29, 2024.

JOHN L. BADALAMENTI
UNITED STATES DISTRICT JUDGE

SA:   FTMP-2

Copies to:   Brian Casey, counsel of record